WILLIAM E. BURR *et al.*

*v.*

JOHN BORDEN *et al.*

| 61 | 389 |
|---|---|
| 143 | 534 |
| 146 | 521 |

1. SALE UNDER POWER IN MORTGAGE—*advertisement.* Where a mortgage sale is announced to be held on the 1st day of March, 1860, between the hours of nine A. M. and four P. M., the advertisement is sufficient, the hours belonging to the ordinary business portion of the day.

2. SALE ON CREDIT—*its validity.* Where such a sale is advertised as for cash, and at the sale the mortgagee states that he will not start it at less than the amount of the mortgage, and a third party bids that amount, there being no other bidders, and after it is struck off to him the mortgagee gives him credit on his bid, and there is no proof that this was done in pursuance of a previous arrangement, such an extension of payment, whatever it may be, is wholly immaterial and does not vitiate the sale.

Syllabus.

. 3. It seems that, even if there had been an understanding between them previous to the sale, that, as to the amount going to the mortgagee, the intending purchaser might, in case he should purchase, consider it a loan at ten per cent, such an arrangement would not, of itself, have vitiated the sale; for, even if it occurred, it did not injure the mortgagor, but was for his benefit.

4. FRAUDULENT SALE—*evidence required.* Where it is charged that the purchaser at a mortgage sale really bought the property for the mortgagee and not for himself, but being called by the complainants as witnesses, both emphatically deny it, but about a year and nine months after the sale the purchaser, who had meantime been drawing the rents of the property, then conveyed the fee to the mortgagee, the inference from such a conveyance is not so strong as to overturn their positive testimony.

5. DEGREE OF FRAUD—*rule amended.* Instead of saying that sales under a power in a mortgage will be set aside on "the *slightest proof* of fraud or unfair conduct," the rule would be more accurately stated by saying "upon proof of the slightest fraud or unfair conduct." But in a case of this kind, as well as in any other, a court must fairly weigh the evidence, and can not set aside a sale merely upon slight proof of unfairness, if met by preponderating evidence on the other side.

6. COMPARISON OF EQUITIES. In all cases of this character, where the sale is attacked, not as simply void for non-compliance with the power, but as voidable on equitable considerations having reference to the unfair mode in which the power has been executed, the decision must turn on a comparison of the equities.

7. INNOCENT PURCHASER—*when protected.* Where land was sold in 1860 for substantially its full value, and in 1867 the property, having, in the meantime, risen almost five-fold in value, was sold to an innocent purchaser at this advanced rate, and he erected upon it a very costly building, a bill filed eight years after the sale by parties who, until that time, had acquiesced in all these proceedings, and no actual wrong or intentional fraud is shown, can not be sustained in equity.

8. ACQUIESCENCE—*application to facts.* Especially should the doctrine of acquiescence be favorably regarded in this State where the value of real estate is so rapidly changing, and persons are under strong temptation to search for defects in sales made years ago in payment of debts, and with which the debtors, at the time, were perfectly content, and where all parties affected by the sale have remained for years equally silent and satisfied. Long experience has clearly shown this rule to be necessary in order to prevent a great mass of vexatious litigation, singularly destitute of merit because generally instituted by persons who have bought for a trifle some dormant and forgotten claim.

Writ of Error to the Superior Court of Cook county; the Hon. John A. Jameson, Judge, presiding.

Messrs. Moore & Caulfield and Mr. H. C. Pindell, for the plaintiffs in error.

Messrs. Barker & Wait, Mr. William Hopkins and Mr. Geo. F. Bailey, for the defendants in error.

Mr. Chief Justice Lawrence delivered the opinion of the Court:

On the 1st of March, 1860, the appellee Borden, holding a note given by one William H. Brand, secured by a mortgage upon a lot in Chicago, sold the lot under a power in the mortgage. The premises were struck off to the appellee Spink, for the amount due on the mortgage, $3536, and a deed was made to him on the same day, and recorded March 30th, 1860. On the 26th of March, 1860, Spink executed to Borden a mortgage to secure the sum of $3966, due March 1st, 1861, with ten per cent interest, and on the 30th of December, 1861, conveyed to him the premises in fee for a consideration expressed in the deed, of $4000. In 1867, Borden sold the premises to the appellee Blake, who has erected upon them very valuable improvements. Prior to the sale in 1860, but subsequently to the execution of the mortgage to Borden, the mortgagor, W. H. Brand, had executed another mortgage upon this and other premises to the heirs of W. M. Brand, to secure certain moneys held by him as their trustee. This is a bill brought in their name to set aside the sale to Spink and subject the property to redemption. The court denied the relief asked and the complainants appealed.

The sale is attacked on three grounds:

*First*—For defect in the advertisement.

*Second*—Because the sale, it is contended, was on credit, when it was advertised as a cash sale.

*Third*—Because, it is alleged, the purchase, though in the name of Spink, was really for the benefit of Borden.

We will consider these in their order.

The objection taken to the advertisement is, that it was not sufficiently specific as to the time of the sale. It announced it to be held on the 1st of March, 1860, between the hours of nine A. M. and four P. M. This mode of advertising sales has always been regarded in this State as sufficient if the hours named belong to the business portion of the day, as they did in the present instance. *Trustees of Schools* v. *Snell*, 19 Ill. 157. Persons who see the advertisement and desire to attend the sale, can easily ascertain the hour by inquiring of the parties about to make the sale. If unwilling to wait at the appointed place, and if deceived by them and prevented from making a desired bid, the sale might be set aside. To require the advertisement to name the precise hour would lead to much practical inconvenience, and often necessitate a postponement of the sale. It is sometimes very desirable for the interests of the debtor to delay a sale for two or three hours in order to await the arrival of persons expected to bid ; or, in consequence of a storm or some other unforeseen emergency. Moreover, if a particular hour were named in all cases, the question whether the sale had been held at the hour named would be a fruitful source of litigation. The mode adopted in this case has been so generally in use as the most convenient mode, and has been so free from any evil consequence, that we are not inclined to hold an advertisement in this form to be, of itself, a sufficient reason for setting aside a sale, the hours named being within the ordinary business hours of the day.

The second objection is, that the sale, though advertised as a cash sale, was really upon credit. This objection proceeds upon the theory that Spink was a *bona fide* purchaser, which, however, is denied in the third objection. The only testimony upon this point is that of Borden and Spink. They both deny that there was any agreement previous to the sale that Spink should have credit on his bid. What extension of payment Borden chose subsequently to give him, is of course immaterial. It seems they were on intimate terms and cousins by

marriage. Spink attended the sale at the suggestion of Borden. The latter, when he offered the property at the sale, stated he would not start it at less than the amount of the mortgage. Spink bid that amount, and as there were no other bidders it was struck off to him. We infer, from all the evidence, that Borden had previously suggested to Spink that the purchase would be a good investment at the amount due on the mortgage. It is quite probable Spink expected to make some such arrangement as actually was made in case he should be the purchaser, but there is nothing whatever in the evidence to show Borden had promised it except the mere fact that the arrangement was made. Spink was assistant cashier of the Marine Bank, and Borden swears he then thought his credit good. He might well have thought Spink could borrow the money at the bank, as Spink swears he could have done, though he also swears he does not think he was really solvent at that time, having speculated heavily in real estate. We do not consider the statement of both the witnesses, denying any arrangement for credit previous to the sale, so improbable, when compared with the other facts, as to justify us in pronouncing it untrue merely because credit was, in fact, given.

But even if there had been an understanding between them previous to the sale, that, as to the amount going to Borden, Spink, in case he should purchase, might consider it a loan at ten per cent, we say now, as we said in *Waterman* v. *Spaulding,* 51 Ill. 430, that we are not prepared to hold such an arrangement would have, of itself, vitiated the sale. Of course, Borden could not have given credit for more than the amount due him, for that would have transgressed his power. It is not pretended he did so. The charge is, that he had previously promised Spink he might have time on his bid at ten per cent interest, or that he would consider the bid a loan of money so far as concerned the amount due Borden. We are altogether unable to see how this injured the mortgagor, even if it occurred. It was, on the contrary, for his benefit. It

stimulated a bidder to offer more than he would otherwise do. Borden was sacrificing, not the rights of the mortgagor, but his own, for the sake of procuring a better bid for the property. The mortgagee, so long as he acts in perfect good faith, should be permitted to do this as the only means of preventing a great sacrifice of the interests of the mortgagor.

The case of *Longwith* v. *Butler,* 3 Gilm. 42, is cited by appellants' counsel upon this point, but there is but the faintest resemblance between this case and that. In that, there was a corrupt combination between certain persons, to which the mortgagees were privy, to prevent competition at the sale and buy the lands at much below their value. To effect this, they bribed other persons, intending to bid, not to do so. The larger portion of the money was going to the Bank of Illinois, and could be paid in the greatly depreciated paper of the bank. The conspirators not only bribed certain persons, but they told another who intended to bid that his bid would have to be paid down, and in good money, and thus dissuaded him from bidding. They then bought the property at their own price, and to a large extent on credit. The court speak of this as holding out false colors, and under the circumstances of that case, as furnishing, of itself, a ground of relief, as it no doubt did, because, in connection with the other evidence, it showed a corrupt and fraudulent combination to sacrifice the rights of the mortgagor.

In the case before us, it is a very striking fact that the land brought within about ten per cent of its full value, and doubtless all that could be got at a forced sale, and undoubtedly more than it would have brought but for the effort made by Borden to procure a purchaser. It was sold at a time when, according to the evidence, property was at its lowest ebb, after the inflation of 1857. While an arrangement of the kind we are now considering might be so connected with other circumstances as to be a badge of fraud in the case before us, if it was ever made at all, it could only have been to induce Spink to bid the full amount of the mortgage, for less than

which Borden refused to start the sale, and which was substantially the value of the land. Certainly, in this case, the mortgagor could not complain.

The final objection is, that Spink really bought the property for Borden and not for himself. On this point it is only necessary to say that both Borden and Spink, who are called by complainants to prove the truth of this allegation, emphatically deny it. The only evidence upon which we are asked to presume against their testimony is, that about a year and nine months after the sale Spink conveyed the fee to Borden. In the meantime, Spink had been drawing the rents of the property. We can not say the inference from this conveyance is so strong as to overturn this positive testimony.

Counsel for appellants repeatedly cite, and with the emphasis of italics, the language of the court in *Longwith* v. *Butler*, *supra*, that sales under a power in a mortgage will be set aside on "the *slightest proof* of fraud or unfair conduct." We are of opinion the rule would have been more accurately laid down by the court if it had said "upon proof of the slightest fraud or unfair conduct." Powers of this sort are regarded with such jealousy by the courts, that sales under them, if attacked in due season, and before the claims of third persons have intervened, will be set aside if not conducted with complete. fairness. But in a case of this kind, as well as in any other, a court must fairly weigh the evidence, and can not set aside a sale merely upon slight proof of unfairness if met by preponderating evidence on the other side. To say that a court will make a decree divesting a legal title upon the slightest proof that may be offered to impeach it, would be inaccurate in any case, and we presume the court in the case cited had in mind rather the degree of the fraud than the degree of the proof.

In conclusion, we will remark that all cases of this character, where the sale is attacked not as simply void for non-compliance with the power, but as voidable on equitable considerations having reference to the unfair mode in which the

power has been executed, the decision must turn upon a comparison of the equities. In that view, the present case is clear. The land, as already remarked, was sold in 1860 for substantially its full value. In 1867, the property having, in the meantime, risen almost five-fold in value, was sold to Blake for $19,000, and he has erected upon it a very costly building, so that it is now worth very much more than even that sum. It is the title of this innocent purchaser, one of a class always favored in courts of equity, that these complainants seek to divest. Not until eight years after the sale do they file their bill. They acquiesced in the sale until the property had vastly increased in value, had been sold to an innocent purchaser, and great additional value been given to it by his improvements. Even if the rights of an innocent purchaser have not intervened, courts are reluctant to annul sales in which parties have acquiesced for years, where there has been no actual wrong or intentional fraud. This principle should be especially regarded in this State where the values of real estate have so rapidly changed, and persons are under strong temptation to search for defects in sales made years ago in payment of debts, and with which the debtors, at the time, were perfectly content. We cast no reflections upon this case. The claim here set up is not a speculative purchase. But our experience in this court has clearly shown us that, in order to prevent a great mass of vexatious litigation, singularly destitute of merit, because generally instituted by persons who have bought for a trifle some dormant and forgotten claim, the doctrine of acquiescence should receive a favorable consideration.

In the case before us, whatever doubts the evidence tends to raise must be resolved against the complainants, when we consider the position of Blake as an innocent purchaser on the one hand, and the long acquiescence on the other, of all parties affected by the sale sought to be set aside.

*Decree affirmed.*