SUSIE K. ELMORE

v.

FRANK A. JOHNSON.

*Filed at Ottawa October 31, 1892.*

1. **ATTORNEY AT LAW**—*amount of compensation where the same is not fixed by contract.* If the amount of compensation be not fixed by the terms of the contract by which an attorney or solicitor was employed, he will be entitled to be paid such reasonable fees as have been usually paid to others for similar services. In such case there will be a contract implied by the law, which will entitle him to recover such reasonable compensation as his services may be worth.

2. **SAME**—*contracts with client—before and after retainer.* Before an attorney undertakes his client's business he may contract with reference to his services and compensation therefor, for the reason no confidential relation exists, and the parties deal with each other at arm's length. The same is true in regard to dealings which take place after the relation has been dissolved.

3. **SAME**—*contracts with client voidable.* Where the title to property is so involved in litigation that the ownership thereof depends upon the decision as to such title, a contract made during the pendency of the litigation, to compensate the attorney for his legal services with a part of the property involved therein, is voidable at the election of the client, irrespective of the fairness or unfairness of the contract, if such election is exercised within a reasonable time.

4. **SAME**—*purchase by—presumption against the validity of the transaction.* In the case of a purchase of the subject matter of the litigation, or of a part thereof, by an attorney from his client, the transaction is presumptively fraudulent, and the burden is on the former to show affirmatively the utmost good faith, the absence of undue influence, a fair price, knowledge, intention and freedom of action by the client, and also that he gave the client full information and disinterested advice.

5. **SAME**—*validity of client's deed—pending the litigation.* Where an attorney employed to manage a litigation without any express contract as to his compensation, pending such litigation procures an agreement of his client to give him half of the property in dispute, and afterward a deed in execution of the agreement, whereby the attorney secures a larger compensation for his legal services than such services are really worth, the client may, by bill filed within a reasonable time, have the deed set aside.

33—143 ILL.

6. EVIDENCE—*to show value of real estate.* To prove the value of city lots, actual sales of similar property in the vicinity and near the time of the inquiry are competent evidence as far as they go. But while such sales may be the most satisfactory evidence of value, yet they are only one of the modes, and not the only one. Purchases made in 1879 are not an exact criterion of values of 1884 in the same vicinity.

7. LACHES — *in filing bill to set aside deed for land.* Where a client, during the relation of client and attorney, conveys to the latter a part of the property in a litigation which proves successful, in payment of legal services, and where the client has knowledge that the part conveyed is of greater value than the services of the attorney, a delay of six years and eleven months in filing a bill to set the deed aside will be such *laches* as to bar the suit.

8. A party entitled to set aside his deed on equitable grounds can not be charged with delay, or with acquiescence or confirmation, unless there has been full knowledge of all the facts and perfect freedom of action. Acts which might appear to be acts of acquiescence will not be held such if the *cestui que trust* is ignorant of the facts, or under the control of the original influence, or otherwise so situated as not to be free to assert his rights.

APPEAL from the Superior Court of Cook county; the Hon. KIRK HAWES, Judge, presiding.

This is a bill filed in the Superior Court of Cook County, on December 11, 1890, by the appellant against the appellee and his wife for the purpose of setting aside a deed made by the appellant to the appellee on January 17, 1884, conveying to him the west half of lots 6, 9, 20 and 23 in the subdivision of S. $\frac{1}{2}$ of S. W. $\frac{1}{4}$ of N. W. $\frac{1}{4}$ of Sec. 22, Town. 39 N., R. 13 E., etc., in Cook County, said west half consisting of 16 of the 32 sublots into which said lots 6, 9, 20 and 23 were subdivided; also for the purpose of requiring Annie C. Johnson, the wife of appellee, to convey to appellant the title held by her to said west half, and also for the purpose of taking an account of monies paid out by appellee for appellant, and of monies received by him for her, and of services by her to him and by him to her, and of losses alleged to have been caused by want of diligence and skill and by alleged misconduct, etc. The

defendants answered the bill. Replications were filed to the answers. Proofs were taken, and, the cause coming on to be heard in May, 1891, the bill was dismissed for want of equity, etc. The present appeal is prosecuted from such decree of dismissal.

The deed was executed by appellant to appellee in payment for his services to her as her solicitor and attorney in the matters hereinafter mentioned. The bill charges, that the defendant, Johnson, was negligent and unskillful in the conduct of the complainant's business; that his services were worth less than the value of the 16 sublots conveyed to him; that the complainant was without means, and, when defendant began to insist upon pay for his services, she agreed to pay him $400.00 if he would obtain title for her to the four lots, or 32 sublots; that, after a decision had been rendered in her favor and before the execution of the master's deed to her, the defendant induced her, by fraudulent representations and false promises, to convey to him the west half of said lots; that she supposed the deed made by her to be a deed of an undivided one half part of the lots when she signed it; that, between the summer of 1883 and November, 1888, she did certain type writing work for the defendant in his office for which he had not paid her; that an execution issued in the attachment suit hereinafter mentioned was returned no part satisfied; that the executions issued upon the decree for alimony hereinafter mentioned could have been collected or secured; that a mortgage suit against the property was allowed to go by default; that the lots have been sold for taxes; that complainant did not know any of the facts in regard to said executions, or the abandonment of the mortgage suit, or the value of defendant's services in the chancery case until the day before filing her bill; that she first retained the defendant to collect her alimony and obtain title to the lots "for a reasonable fee and reward;" that she did not learn of the tax sales until "somewhat over a year" before filing her bill; that she first discov-

ered the facts as to defendant's negligence and misconduct, etc., within a few days before filing the bill.

The answer of the defendant denies all the allegations of the bill as to fraud, neglect or misconduct, and as to the agreement to take $400.00 for services, and sets forth a history of his professional relations with the complainant, and gives his explanation of the various matters referred to in the bill, and charges *laches*, etc.

On September 24, 1879, the complainant, who was then about 33 years old and had been divorced from a former husband named Elmore, delivered to one Collins Pratt, an attorney in Chicago, government bonds owned by her to the amount of $600.00 to be by him converted into money and loaned out upon real estate security. Pratt used this money to purchase said lots 6, 9, 20 and 23, and obtained a deed of the same to himself on September 24, 1879. He then executed his own note, dated October 4, 1879, for $600.00 payable in two years to the order of complainant with interest at 8 per cent, and also a trust deed to secure the same upon said lots to one Paul Mockenhaupt, as trustee, and delivered said note and trust deed to the complainant. On March 8, 1880, Pratt who was at that time engaged to be married to the complainant, obtained the note and trust deed from her upon some representation that it would be necessary to change the securities in view of their approaching marriage, and applied to Mockenhaupt for a release of the trust deed, which was executed and delivered to Pratt on said 8th day of March, 1880. On March 24, 1880, the complainant and Pratt were married, and lived together until about May 1, 1880, when he abandoned her.

During said marriage and on April 13, 1880, Pratt borrowed $500.00 of one Eimers, and executed his note of that date for that amount payable in two years to the order of Eimers, and to secure said note he and appellant conveyed said lots 6, 9, 20 and 23 to Charles Thornton, trustee, by trust

deed of same date. On the same day April 13, 1880, there was filed for record a warranty deed, executed by Pratt, and purporting to have been also executed by complainant as his wife, conveying said lots 6, 9, 20 and 23 to one Addie Pratt, a reputed sister of Collins Pratt, in whose name a subdivision was made of the four lots into the 32 sublots above referred to. On April 30, 1880, the defendant executed his unsecured note to the complainant for $600.00 payable two years after date with 8 per cent interest. This latter note complainant claims to have known nothing about until long afterwards, when she was trying to collect the $600.00 from Pratt and he stated that he had given his note therefor. She says that she then examined her trunk and papers and found the note for the first time.

On November 1, 1881, complainant obtained a decree of divorce from Collins Pratt upon the ground of adultery, which decree required him to pay her $40.00 every month as alimony, and changed her name to Susie K. Elmore. Mr. John W. Waughop was her solicitor in the divorce suit. Soon after the separation between complainant and Pratt, she employed Mr. Leonard Swett to collect the $600.00 from Pratt, and Mr. Swett succeeded in obtaining $250.00 of that amount for her. About the time of the decree of divorce, or soon thereafter, Mr. Waughop had made an agreement for her with Pratt, by the terms of which Pratt was to pay $500.00 in full discharge of alimony and of the balance due upon the claim for $600.00, said sum of $500.00 to be paid at the rate of $5.00 per week. She was paid $5.00 per week up to and until February 18, 1882. It would appear that Mr. Swett received $50.00 for his services and Mr. Waughop nothing.

By deed, dated January 7, 1879, one Arnold and his wife sold and conveyed to Collins Pratt and Edgar M. Wilson lots 2, 13, 16 and 27 in said subdivision for an expressed consideration of $600.00; and, to secure their note for $500.00 payable in three years to order of William Fitzgerald with 10 per

cent interest, Pratt and Wilson executed a trust deed, dated January 21, 1879, conveying said last named lots to O. T. Hartigan, trustee.

Such being the condition of affairs, the complainant, about the middle of February, 1882, applied to the defendant, Johnson, to act as her attorney and solicitor in recovering what might be due to her in money or property from her former husband, Collins Pratt. Accordingly, on February 23, 1882, the defendant filed a bill for the complainant, as her solicitor, in the Circuit Court of Cook County, against the said Collins Pratt, Addie Pratt, Eimers and Thornton. This bill was sworn to by Mrs. Elmore. It sets up the facts hereinbefore stated; it charges that the note of April 30 was never delivered to her or accepted by her, that Pratt obtained the $600.00 to use for himself and deceived her in respect thereto, and attempted to defraud her out of the money; that either her signature to the deed to Addie Pratt was forged, or obtained from her by fraud and misrepresentation, and without consideration; that lots 2, 13, 16 and 27 are of the value of $1000.00 and are the only property owned by Pratt; that said $600.00 was not loaned to Pratt, but entrusted to him for conversion into real estate securities drawing 8 per cent; that the note and Mockenhaupt trust deed were obtained from her in order to cheat and defraud her and get a release of the trust deed; that the Eimers note and Thornton trust deed were without consideration, or accepted with notice of her rights, and with the intent to cheat and defraud her; the bill offers to return and cancel the note of April 30; it contains the following averment: "your oratrix believes and on belief avers the fact to be, that said defendant purchased said real estate (lots 6, 9, 20 and 23) with the money so entrusted to him as aforesaid to be invested by him in good real estate securities;" the bill prays, that the release deed made by Mockenhaupt may be set aside and cancelled, and that the trust deed to him may be declared to be in full force and a valid lien upon said lots

for the balance of the $600.00 due from said Collins, and for such other relief as the nature of the case may require and may seem meet. On March 18, 1882, the bill was amended by averring that Pratt was then the owner of said lots 6, 9, 20 and 23 and held an unrecorded deed, dated February 9, 1882, from Addie Pratt to himself. On March 10, 1883, the prayer of the bill was amended as follows : "or that Pratt may be declared to hold the title * * * in trust * * * and may be required to convey the same to your oratrix, and that the said deed * * * to said Addie Pratt may be declared null and void and may be set aside," etc.

At the April Term, 1882, Collins Pratt answered the bill, alleging that complainant loaned her money upon his note, secured by the trust deed to Mockenhaupt, after investigation and advising with others ; that said trust deed was released in order to borrow $500.00 to buy household furniture in view of the approaching marriage ; that complainant has some of the goods bought with the money borrowed of Eimers ; that she accepted the note of April 30 ; that he has paid $290.00 instead of $250 ; that she fully understood the contents of the deed to Addie Pratt ; the answer admits the purchase of lots 6, 9, 20 and 23, and the ownership of an undivided half of lots 2, 13, 16 and 27, and denies all charges of deception and fraud, or forgery, or misrepresentation, and also denies that he now owns lots 6, 9, 20 and 23 or holds an unrecorded deed of the same from Addie Pratt.

Addie Pratt also filed an answer to the bill denying that the deed to her was without consideration, or obtained by fraud, or that complainant's signature thereto was forged, or that defendant had made a deed to Collins Pratt, and averring that said deed to defendant was executed for a good consideration and was understood by complainant when she signed it.

April 13, 1882, replications were filed to the answers. March 17, 1883, the bill was dismissed as to Eimers and Thornton, and the cause placed upon the trial calendar. The

hearing took place- on November 23 and 27, 1883, the defend-
ants being represented by counsel. The decision was in favor
of the complainant, and a decree in accordance with the deci-
sion was entered on December 8, 1883. The decree found,
that Pratt purchased lots 6, 9, 20 and 23 with complainant's
money; that the note to Eimers and trust-deed to Thornton
were valid, but that the $500.00 borrowed of Eimers was used
by Pratt and exceeded the amount which had been paid by
him to complainant; that a resulting trust had therefore arisen
in favor of complainant, and she was entitled to have the title
acquired by Pratt in said lots conveyed to her; that the deed
to Addie Pratt had been procured by fraud; that the lots had
been sold under decree in favor of Eimers; that the unsecured
note of April 30 had been surrendered on the hearing; the
decree set aside the deed made by Collins Pratt to Addie Pratt,
and ordered said Collins to execute a deed of the lots to com-
plainant, subject to the rights of the purchaser under the
foreclosure decree of Eimers, within 30 days, and upon his
failing to do so that the master execute said deed.

On January 16, 1884, the master executed to the complain-
ant a deed of lots 6, 9, 20 and 23, and on the next day,
January 17, 1884, complainant executed and delivered to the
defendant the deed of the west half of said lots above referred
to. The deed from the master to her was not recorded until
January 17, 1884.

Some time in June, 1882, Eimers filed a bill to foreclose
the trust deed securing his note upon lots 6, 9, 20 and 23.
Appellee entered the appearance of appellant in said foreclos-
ure suit, and a decree of sale was entered therein, and said
lots were sold under said decree on September 3, 1883, to
Eimers for $676.23.

The certificate of sale was purchased by appellee and ap-
pellant from Eimers on August 23, 1884, for $731.00, one
half, $365.50, having been paid by appellee, and the other
$365.50 by appellant. The certificate was assigned to Mrs.

Johnson. As soon as the time for redemption expired, which was on December 3, 1884, the master took up the certificate and made a deed conveying the whole of the four lots to Mrs. Johnson. Thereupon, on December 8, 1884, Mrs. Johnson and appellee, her husband, united in a deed conveying all their interest in the east half of the lots to the appellant.

In addition to the chancery suit, appellee took other proceedings. On March 1, 1882, he began an attachment suit to recover $388.38, sworn by the complainant to be the balance of the $600.00 then due to her, charging that the debt had been fraudulently contracted. The attachment writ was levied upon lots 6, 9, 20 and 23 and also upon lots 2, 13, 16 and 27. Judgment was rendered therein on April 5, 1882, and general and special execution issued on November 15, 1882. No levy, however, was made under the execution but it was returned unsatisfied.

Proceedings were also commenced to enforce the decree for alimony, and to set aside the agreement to settle for $500.00 payable at the rate of $5.00 per week. On March 6, 1882, appellee filed in the divorce suit an affidavit sworn to by complainant on March 2, 1882, setting up the decree for alimony, the receipt of $5.00 per week up to February 18, 1882, the delivery to Pratt of the $600.00, the release of the trust deed, etc., and alleging that there was due to her $388.38, that the settlement for $500.00 had been made upon representations as to Pratt's poverty, and had never been fully approved of by her; that she had given notice of her intention not to accept the $500.00; that Pratt had purchased lots 6, 9, 20 and 23 on September 29, 1879, for $600.00, "and affiant is informed that they are now worth about $3000.00 and are encumbered to the extent of $540.00 only;" that Pratt owns lots 2, 13, 16 and 27 encumbered for $600.00; that he refuses to to pay $75.00 due to her for alimony. A rule was entered by the court after a contest and after reading other affidavits, requiring Pratt to pay the $75.00 within a certain time. Upon

his failure to do so an attachment was issued and he was arrested for contempt of Court, and entered into a recognizance to appear on May 1, 1882, to answer the charge of contempt. He did not appear, however, but fled from the State and went to Dakota where he has remained ever since. During the period from April 8, 1882, to August 21, 1883, appellee caused six executions to be issued upon the decree for alimony for the amounts thereof accruing from time to time, but realized nothing.

On May 6, 1882, Hartigan sold lots 2, 13, 16 and 27 under the trust deed to him, for default in the payment of the principal of the note secured thereby and interest thereon, and executed a trustee's deed to the purchasers Edgar M. Wilson and Edward B. Holmes. All the lots were so sold for $682.43.

Mr. ALEXANDER S. BRADLEY, for the appellant:

If an attorney, after commencing a suit without a special contract for fees, contracts with his client or gets his deed for one-half of the property in litigation, it must be held, in equity, as a mere security for his reasonable fees. Weeks on Attorneys, secs. 364, 273, 281; *Lecatt* v. *Sallee*, 3 Port. 115; *Pearson* v. *Benson*, 28 Beav. 598; *Burner* v. *McLane*, 1 Hoff. Ch. 424; *Newman* v. *Payne*, 2 Ves. 199; *Wood* v. *Downe*, 18 id. 119; *Starr* v. *Venderhegden*, 9 Johns. 253; 4 Edw. Ch. 599.

The burden is upon the attorney to show the fairness of the transaction. Perry on Trusts, secs. 202, 203; Weeks on Attorneys, secs. 278, 271, 273; Story's Eq. Jur. sec. 310; *Jennings* v. *McConnel*, 17 Ill. 148; *Gibson* v. *Jeyes*, 6 Ves. 271; *Staley* v. *Dodge*, 50 Ill. 43; *Trotter* v. *Smith*, 59 id. 240; *Dunn* v. *Record*, 63 Me. 17.

The confidential relation, and its influence over appellant, continued until shortly before the bringing of this suit, and appellant made no undue delay in filing her bill. So long as the influence exists the rule applies, though the techincal relation has ceased. Weeks on Attorneys, secs. 255, 373.

An attorney's duty does not cease upon the recovery of a judgment. *Smyth* v. *Harvie*, 31 Ill. 62.

As to any alleged unreasonable delay on her part, we also cite *Gibbons* v. *Hoag*, 95 Ill. 45; *Jones* v. *Lloyd*, 117 id. 599; *Breit* v. *Yeaton*, 101 id. 242.

Mr. JAMES E. MUNROE, for the appellee:

It is not the law that an attorney can not purchase from his client the subject matter of the litigation pending. *Morrison* v. *Smith*, 130 Ill. 304.

All that the rule in question requires, is that it appear the attorney took no advantage of his client, and acquired no more than a fair and just professional remuneration for his services. *Yeamans* v. *James*, 27 Kan. 207.

Where the attorney's services are purely professional, and do not bring him into acquaintance with the value of the subject matter of the litigation, then, as to the mere question of the value of the subject of the litigation, the parties stand at arm's length, and upon an equality. *Rogers* v. *Marshall*, 3 McCrary, 89.

The bill is barred by *laches*. *Smith* v. *Clay*, Ambler, 645; *Cox* v. *Montgomery*, 36 Ill. 396; *Hall* v. *Fullerton*, 69 id. 448; *Burr* v. *Borden*, 61 id. 390; *Hoyt* v. *Pawtucket Inst.* 110 id. 390.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Appellee testifies, that the deed made to him by appellant, conveying to him the west half of the lots in controversy, was executed by her in pursuance of a previous contract, which she had made with him, in reference to payment for his legal services. He swears, that, by the terms of this contract, she was to pay all the costs and he was to have a contingent fee of one half of what should be recovered both in the suit for alimony, and in the chancery suit in regard to the lots.

The evidence shows, that this contract was made during the pendency of the legal proceedings which the appellee was

conducting for the appellant. It was not entered into before, or at the time of, his original employment, which took place on February 15, 1882, nor did it exist when he filed the bill on February 23, 1882. His answer states, that "early in the spring or summer of 1882 * * * it was * * * mutually agreed that this defendant should have and receive as a contingent fee for his services one half." He testifies, that he cannot fix the date of the agreement, but that, to the best of his recollection, "it was in March, or April, possibly in May, after I discovered I had a pretty good-sized job on hand, and a good deal of work to do, and had done a good deal of work. * * * She claimed to have no money early in the proceedings, and could not pay my fees in money, and that was why I subsequently made a different arrangement with her."

Appellant swears that she never made an agreement with the appellee to give him one half of the money, or of the land, to be recovered.

The deed to appellee was also executed while the relation of attorney and client existed between himself and the appellant. That deed was made on January 17, 1884, and he concedes that he did not cease to be appellant's solicitor until some time thereafter.

In England "it is a settled doctrine of equity that an attorney cannot, while the business is unfinished in which he has been employed, receive any gift from his client, or bind his client in any mode to make him greater compensation for his services than he would have a right to demand if no contract should be made during the relation." (Weeks on Attorneys at Law,—2d ed.—sec. 364). More than fifty years ago, the English doctrine was adopted by the Supreme Court of Alabama in an able opinion in the case of *Lecatt* v. *Sallee*, 3 Port. 115, where it was held, that "an agreement made by a client with his counsel after the latter has been employed in a particular business, by which the original contract is varied,

and greater compensation is secured to the counsel, than may have been agreed upon, when he was first retained, is invalid, and cannot be enforced." The reason for the doctrine is to be found in the nature of the relation, which exists between attorney and client. That relation is one of confidence, and gives the attorney great influence over the actions and interests of the client. In view of this confidential relation, transactions between attorney and client are often declared to be voidable, which would be held to be unobjectionable between other parties. The law is thus strict, "not so much on account of hardship in the particular case, as for the sake of preventing what might otherwise become a public mischief." (Lewis v. J. A. 4 Edwards Ch. Rep. marg. page 599; top page 622). "No single circumstance has done more to debase the practice of the law in the popular estimation, and even to lower the lofty standard of professional ethics and self-respect among members of the legal profession itself in large portions of our country, than the nature of the transactions, often in the highest degree champertous, between attorney and client, which are permitted, and which have received judicial sanction. It sometimes would seem, that the fiduciary relation and the opportunity for undue influence, instead of being the grounds for invalidating such agreements, are practically regarded rather as their excuse and justification." (3 Pomeroy's Eq. Jur. sec. 960, note 1). Before the attorney undertakes the business of the client, he may contract with reference to his services, because no confidential relation then exists and the parties deal with each other at arm's length. The same is true in regard to dealings which take place after the relation has been dissolved. (1 Story's Eq. Jur.—13 ed.—secs. 310 to 313). But the law watches with unusual jealousy over all transactions between the parties, which occur while the relation exists.

In the case at bar, it does not appear that any definite contract in regard to fees existed between appellant and appellee

prior to the spring of 1882. But inasmuch as he undertook to manage her legal interests before that time, there was an implied contract, created by operation of law, which entitled him to receive such reasonable compensation as his services might be worth. "If the amount of compensation be not fixed by the terms of the contract, by which an attorney or solicitor was employed, he would be entitled to be paid such reasonable fees, as have been usually paid to others for similar services." (*Lecatt* v. *Sallee, supra*).

The question then arises, what was a reasonable compensation for the services rendered by the appellee to the appellant. He has introduced no independent evidence upon this subject. His only witness is an office companion, who says, that, in his opinion, appellee's legal services were worth $30.00 per day, but does not claim to have full knowledge of the services rendered in the matters herein involved. Appellee is unable to state, except approximately, the time spent by him in attending to appellant's matters, but he says: "I believe that in the whole matters * * * I spent at least forty days." Forty days' services at $30.00 per day would be $1200.00.

We do not think, however, that the proof establishes $1200.00 as the value of the services. Mr. W. I. Culver swears, that the customary and usual charge for all the work done by appellee in the divorce, attachment and "resulting trust" cases would be $250.00 in money. Mr. B. F. Richolson, the attorney for Pratt, swore that appellee's services in the chancery, or "trust," suit in regard to the land were reasonably worth from $300.00 to $350.00, and he made the following statement: "If the fee was contingent upon success, I think he would be justified in charging somewhat more; I hardly think double that, because I think the success was so reasonably assured there was not very much doubt."

What was the value of the lots, of which appellee was to have one half? In the affidavit filed by appellant in the divorce proceeding on March 6, 1882, she swore that she had been

informed that the lots were then worth $3000.00, and were encumbered for $540.00 only. This affidavit was drawn by appellee, and was presented to the court upon an application to set aside the agreement of settlement for $500.00. We cannot suppose, that the value of the lots was exaggerated, in order to induce the court to believe that Pratt was not too poor to pay more than $500.00. Taking $3000.00 as the estimated value of the lots on March 6, 1882, then, by appellee's agreement for fees, he was to get property worth $1500.00 less $270.00 of encumbrance, amounting to $1230.00. This amount exceeded the reasonable compensation to which appellee would have been entitled under the implied contract, under which he began his services for appellee.

We have recently held in *Morrison* v. *Smith*, 130 Ill. 304, that a sale by a client to an attorney will be sustained, if it is fair and honest and in no manner tainted with fraud, undue influence or corruption, and that the law does not go so far as to hold such a sale voidable at the election of the client. In that case the subject matter of the purchase by the attorney from the client was a judgment obtained by the former for the latter. The judgment debtor was insolvent except as to his ownership of an undivided interest in land, which was subject to a life estate. The doctrine of that case is the law of this Court as applied to such a purchase by an attorney from a client as is there described. The litigation had reached the point where judgment had been obtained; the judgment was a lien upon a reversionary interest in land; its value could, therefore, be easily ascertained by ascertaining the value of the interest in the land subject to the life estate. But there is a manifest distinction between a purchase by an attorney from a client, and a contract, made during the pendency of a litigation, for the conveyance or transfer by the client to the attorney of a part of the property involved in the litigation, as a compensation for his legal services therein. Where a purchase is proposed, the seller is always, to a certain extent,

put on his guard. He knows that it is for the interest of the buyer to get the property as cheaply as possible. He has every motive to enquire into and learn the value of the thing to be sold. But, in the case of the contract above indicated, the client is at a great disadvantage. The value of the property in litigation depends upon the result of the litigation; and being unable to understand the legal aspects of the case, he is unable to foresee what such result will be. He must rely, not upon his own judgment, but upon the judgment and statements of his attorney. Moreover, he is unable to judge as to the value of his attorney's services, because he cannot know what legal steps are necessary to be taken in the conduct of the case. The advantage is overwhelmingly on the side of the attorney where such a contract is made. Whatever may be the rule as to a purchase by an attorney from a client, we think, that, where the title to property is so involved in litigation that the value of the property depends upon the decision as to such title, a contract made during the pendency of the litigation to compensate the attorney for his legal services with a part of the property involved therein, should be held to be voidable at the election of the client, irrespective of the fairness or unfairness of the contract, provided such election is exercised within a reasonable time. Such a rule as this is demanded by public policy and in the interests of a wholesome administration of justice. The distinction here noted is pointed out in *Berrien* v. *McLane et al.* 1 Hoff. Ch. Rep. 420, where it is said: "A voluntary gift made while the connection of attorney and client subsists is absolutely void, and the property transferred by it can only be held as security for those charges which the attorney can legally make. Next, * * * a transfer of property made upon an ostensibly valuable consideration, such as a lease or sale, is presumptively void; the client has the advantage of driving the attorney to produce evidence to prove its fairness, and to show that the price or terms were as beneficial as could have been obtained from a

stranger. And lastly * * * a transfer of a part of the property actually in litigation, *or a contract to. transfer a part,* is * * * void; illegal * * * because of the existing relation of the parties : * * * such a contract will not be enforced·on the application of the attorney ; and if the client applies will be cancelled on equitable terms."

The above passage from the *Berrien* case is quoted for the purpose of showing, that a distinction is recognized between a sale and a transfer of a part of the property in litigation in payment of fees, or a contract to transfer the same, but we do not go so far as to hold with the learned vice-chancellor in that case, that such a contract or transfer is absolutely void, but that it is voidable at the option of the client. The view here expressed is supported by the following authorities. ·(*Rogers* v. *Marshall,* 3 McCrary, 76, and note to first opinion and cases cited in note; 4 Kent's Com.—12 ed.—page 449 note b ; *Wallis* v. *Loubat,* 2 Denio, 607 ; *Lecatt* v. *Sallee, supra; Pearson* v. *Benson,* 28 ·Beavan, 598; *Newman* v. *Payne,* 2 Vesey, Jr. 199 ; *Wood* v. *Downes,* 18 Vesey, Jr. 119 ; *Lewis* v. *J. A. supra; Starr* v. *Vanderhegden,* 9 Johns. 253; *West* v. *Raymond,* 21 Ind. 305 ; *Simpson* v. *Lamb,* 40 Eng. Law & Eq. 59 ; *Hall* v. *Hallett,* 1 Cox, 134 ; *Hawley* v. *Cramer,* 4 Cowen, 717 ; Weeks on Att'ys at Law—2 ed.—sec. 273 ; *Armstrong* v. *Huston's Heirs,* 8 Ohio, (Hammond) 552 ; *Gray* v. *Emmons,* 7 Mich. 533 ; *Merritt* v. *Lambert,* 10 Paige, 352 ; *Bolton* v. *Daily,* 48 Iowa, 348 ; 1 Perry on Trusts—3 ed.—sec. 202.

But even if the rule, which applies to a purchase by an · attorney from his client, should be held to be applicable in the present case, the contract and the deed made in pursuance thereof must be ·subjected to a rigid test. In case of such a °purchase, the transaction is presumptively fraudulent, and the burden is on the attorney to show "fairness, adequacy and equity." (*Lewis* v. *J. A. supra*). He must remove the presumption against the validity of the transaction "by showing affirmatively the most perfect good faith, the absence of undue

31—143 ILL.

influence, a fair price, knowledge, intention and freedom of action by the client, and also that he gave his client full information and disinterested advice." (2 Pom. Eq. Jur. sec. 960.)

In order to sustain the deed made to appellee on January 17, 1884, it must appear that the consideration received by appellant was "adequate," and that the appellee paid "a fair price." This involves the determination of the question whether the services rendered to the appellant were worth what the property was worth on the day of the delivery of the deed. Counsel on both sides have presented this as one of the material issues in the case, and have introduced testimony to show the value of the lots in January, 1884. Of appellant's witnesses three swore that the lots were then worth $3200.00; two, that they were worth $4000.00; and two, that they were worth $4800.00. Of appellee's witnesses two placed the value of the lots at that time at about $900.00, one at from $1000.00 to $1400.00, one at $1200.00, and one at from $1950.00 to $2400.00.

It is claimed by counsel for appellee, that the valuations of his witnesses are based upon actual sales, while the valuations proven by appellant are matters of opinion formed from a general knowledge of values. It has been well said, that "there is no more important factor in determining the value of particular property than the sales of similar property in the same neighborhood at about the time in question." (Lewis on Eminent Domain, sec. 443). We have held, that "actual sales of property, in the vicinity and near the time, are competent evidence, as far as they go." (Provision Co. v. City of Chicago, 111 Ill. 651). But, while such sales may be the most satisfactory evidence of value, yet they are only one of the modes of proving value, and not the only mode. (St. L., V. & T. H. R. R. Co. v. Haller, 82 Ill. 208). It is true that the witnesses of appellant do not testify to actual knowledge of sales, made in the neighborhood where these lots are located in the year 1884, or about that time, and that some of the witnesses of appellee do refer to sales. Purchases made in

1879, are not an exact criterion of values in 1884. Nor are forced sales under trust deeds and foreclosure decrees always a correct indication of value. After making allowance for the difference thus indicated between the testimony produced by appellee and that produced by appellant, we are unable to reach the conclusion, that the value of the services rendered to the appellant was equal to the value of the lots conveyed to appellee in January, 1884.

We cannot say, however, after a careful review of the evidence, that the contract for compensation and the deed made in pursuance thereof are liable to any other objections than these two: 1st, they were executed during the existence of the relation of attorney and client; 2nd, they secured a larger compensation for legal services than those services were really worth. We see no evidence of any undue influence exercised by the appellee over the appellant, except perhaps in the matter of obtaining from her a renewal of the contract. In the fall of 1882 appellee seemed to fear that appellant would make a settlement with Pratt without consulting him, or upon a basis not approved by him; and on November 24, 1882, he wrote her a letter, in which, after referring to her previously expressed desire that he should conduct her business "upon a contingent fee of 50 per cent of the amount recovered," he said: "A definite understanding is therefore necessary before any further action is taken." He says that after this date she renewed the contract for one half of what should be recovered; and, thereafter, in March, 1883, as the record shows, he amended the bill by praying that Pratt be declared a trustee, etc. It was said in *Bolton* v. *Daily, supra:* "We think that where an attorney sets up an express agreement to pay more than an ordinary fee, exacted of a client when the work was two thirds done, under a threat of withdrawing from the case if the agreement was not made, nothing but the best of reasons would be sufficient to uphold the agreement." Here, however, the implied threat to take no further action without a definite

understanding had reference to reaffirming a contract already made rather than to the making of a contract for the first time. Appellee had perhaps good reasons for asking for a definite understanding. The appellant had thrown out intimations of a settlement of her litigation. She had shown herself to be changeable in her humor, and had already employed two attorneys besides appellee in her lawsuits. She had repudiated the agreement of settlement entered into with her second husband. She had made some incorrect statements to her counsel: for example, she had charged that the note to Eimers and the trust deed to Thornton had been obtained by fraud, when the evidence overwhelmingly established the fact that those securities represented a *bona fide* loan, and that she herself had voluntarily united in the execution of the trust deed.

Aside from the haste with which appellee secured his deed on January 17, 1884, we are satisfied that the action of appellant in the execution of that deed was free and voluntary. She admits that she was pleased with the result reached in getting a decree for the lots. The proof does not sustain her in the claim which she now makes, that she thought she was conveying to appellee an undivided one half of the lots, so that as co-tenant she would have the benefit of his services in the future management of the property. On the contrary, the proof shows, that the deed was fully explained to her, and that she well understood it to be a conveyance of the west half of the lots, and that she chose the east half in preference to the west half upon being given her choice.

We think the proof also shows that appellant was fully advised of all the steps taken in the suit. She was acquainted with the value of the lots, and received information in relation thereto from the beginning of her troubles, having accepted a trust deed thereon in 1879, and having executed a trust deed thereon in 1880. In 1882 she had made an affidavit as to the value of the lots. Afterwards she is shown to have talked with a number of persons in regard to the future outcome of

the property. She was a shrewd, capable, business woman; had been engaged in business before she married Pratt; and, though without much ready money, owned a house and two lots in a suburb called Melrose.

If appellant had filed her bill within a reasonable time, we are of the opinion that she would have been entitled to have the deed to appellee set aside, either upon the ground that both the deed and the contract which preceded it were obtained from her while the relation of client and attorney existed between herself and appellee, or upon the ground that the property, agreed to be given and subsequently conveyed to appellee as compensation for his legal services, was worth more than the reasonable and customary value of those services. But inasmuch as the contract, which appellee could not have enforced, was fully completed and executed by the conveyance to him of one half the property, the question arises whether or not appellant has been guilty of *laches* in not sooner filing her bill to have the deed set aside. From January, 1884, when the deed was made, to December, 1890, when the present bill was filed, a period of almost seven years elapsed. In connection with the question of *laches* it is a fair subject of inquiry, under the facts of this case, whether the conduct of the appellant does not show acquiescence, if not confirmation, on her part.

Where bills are filed to set aside contracts or deeds between parties standing in a confidential relation to each other, the defense of *laches* is not usually regarded with favor. It has been said that "length of time weighs less in such a case than in any other," and that it is "extremely difficult for a confidential agent to set up an available defense grounded on the *laches* of his employer." (*Wood* v. *Downes*, 18 Vesey, Jr. 130, note 1.) But even in cases where it has been held, that such contracts and sales, without reference to their fairness or honesty, will be set aside upon the application of the party in interest, it has at the same time been held, that such applica-

tion must be made within a reasonable time to be judged of by the court under all the circumstances of the case. (*Hawley* v. *Cramer*, 4 Cowen, 717; *Smith* v. *Thompson's Heirs*, 7 B. Monroe, 310; *Fox* v. *Mackreath*, 1 Lead. Cases in Eq. pt. 1, White & Tudor (4th Am. Ed.) p. 188, sec. 115 and page 257; *McCormack* v. *Martin*, 5 Blackf. 509; *Williams* v. *Reed*, 3 Mason, 405.) What is a reasonable time cannot well be defined, but must be left, in large measure, to the determination of the Court in view of the facts presented. Equity does not always follow the period of limitation fixed by statute and enforced in courts of law. Parties will be required to assert their rights within a shorter time in States where the values of real estate increase rapidly, and greater temptations are thereby afforded for speculative litigation. (*Burr* v. *Borden*, 61 Ill. 389.) But the party, who is entitled to set the transaction aside, cannot be charged with delay, or with acquiescence, or confirmation, unless there has been full knowledge of all the facts, and perfect freedom of action. Acts, which might appear to be acts of acquiescence, will not be held to be such, if the client or *cestui que trust* is ignorant of the circumstances, or under the control of the original influence, or otherwise so situated as not to be free to enforce his rights. (*Rogers* v. *Marshall, supra; Hawley* v. *Cramer, supra.*) Confirmation may be evidenced by long acquiescence, "as by standing by and allowing the purchaser to lay out money in the firm belief that his title would not be contested." (*Pearson* v. *Benson*, 18 Beav. 598.)

Let us see how the appellant stood relative to the two objections, heretofore pointed out, on January 17, 1884, and for nearly seven years thereafter. She must be held to have known that the property, which she conveyed to appellee was worth more than his services. She alleges in her bill in this case, that she agreed to pay him $400.00, and, while that allegation is not sustained by the proof, she must be held to be bound by it. In her testimony, after stating that appellee

introduced the subject of his fees after Pratt's arrest, she says: "I asked him  *  *  *  what would be his fees for attending to all my business and making everything perfectly clear and straight for me.  *  *  *  He said there was a great deal of work about the case and would probably be a great deal more, and he would have to have $400.00." She swears that she thus knew the value of his services as fixed by himself. On January 17, 1884, with knowledge, according to her own evidence, that his services were estimated by himself to be worth only $400.00, she conveyed to him one half of property, which she had sworn to be worth $3000.00 in March, 1882, and which was of greater value in 1884.

With admitted knowledge as to the disparity between the value of the land and the value of the services, she permitted the appellee to deal with the west half of the land as his own, and recognized him as the owner thereof, for six years and eleven months, without giving any intimation that she intended to disturb his title. In December, 1884, he paid off one half of the incumbrance held by Eimers, and she not only permitted him thus to spend his own money on the property, but furnished him with the money to pay off the other half of the incumbrance for herself. From June 30, 1884, down to the time of filing the present bill, she paid taxes on the east half of the property and suffered him to pay taxes on the west half, sometimes taking the money over to the treasurer's office for him and paying his taxes for him on the west half. A little more than a month before filing the bill, she paid $83.35 for an outstanding tax title against the east half, and he at the same time with her consent paid the same amount for a tax deed to himself of the same outstanding title against the west half. In 1888 and 1889 she made efforts not only to sell her own lots in the east half, but also to sell for him the lots in the west half which she had conveyed to him. She went out to the property in 1885 and employed a man to plant trees for her on the east half, telling him that appellee owned

the west half.   In 1886 she had some negotiation with one Whittemore about selling one of her lots in the east half to him, and spoke of Johnson as the owner of the west half by deed from herself for services.  At another time she was present when appellee offered to sell his lots in the west half for $75.00 a lot, and talked to the same party about buying her own lots in the east half.  In 1887 she occupied a part of the office of a real estate agent named Hopson, and proposed to him that he should sell her lots, referring to appellee as the owner of the adjoining lots and as being willing to sell them.

The evidence shows, that between January, 1884, and December, 1890, a belt line railroad was built to the west of these lots, and the Wisconsin Railroad Company laid its tracks in the neighborhood, and certain locomotive works were located in that vicinity.   On account of these improvements the lots, which had been bought for $600.00 in 1879, had become worth $16,000.00 in 1890.

It appears from the evidence that the defendant went into the office of the appellee as a type-writer in 1883 and did the business of a typewriter for several years.   The appellee and two other attorneys had each a private room, and a large reception or waiting room.   The appellant was permitted to use a type-writer belonging to appellee, occupying the reception room for that purpose.   She was allowed the use of the room and of the type-writer without charge, and, in consideration thereof, she did for appellee such typewriting as he required. We cannot see that the appellee owed her anything for work done under this arrangement.   While she was in his office, she seems to have done a profitable business as a type-writer for outside parties.   When she procured a typewriter of her own and took another office in the same building, he paid her for the services which she rendered.

Upon the grounds of *laches* and acquiescence we think that the court below properly dismissed the bill.

The decree of the Superior Court of Cook County is affirmed.

*Decree affirmed.*