### UNITED STATES v. COFFIN et al.

(Circuit Court, D. Nevada. September 6, 1897.)

No. 625.

1. FRAUDULENT ASSIGNMENT—PRISONER AND HIS ATTORNEYS—SUFFICIENCY OF EVIDENCE.

On the day of his conviction of the larceny of a large amount from the government, a prisoner withdrew money and mortgages from a bank, where they had been deposited to indemnify the sureties on his bail bond, and, between the time of his conviction and sentence, assigned the mortgages to his attorneys and his wife, and paid the money to his wife. The evidence as to the value of the mortgaged property, the amount of fees due his attorneys, and whether the assignment to them was to secure, or in payment of, their fees, was very conflicting, and the entire transaction was surrounded with mystery. *Held* not sufficient to warrant a decree setting aside the assignments as having been fraudulently made to prevent recovery of the fine imposed as part of the sentence.

2. DEALINGS BETWEEN ATTORNEY AND CLIENT—BURDEN OF SHOWING FAIRNESS.

In any transaction between an attorney and client which is advantageous to the attorney, he is bound to show that it is fair, just, and equitable, and that the client was in a position to deal with him at arm's length.

Charles A. Jones, U. S. Atty.

Torreyson & Summerfield, for respondents Coffin and Woodburn.

Robert M. Clarke, for respondent Heney.

HAWLEY, District Judge (orally). This is a suit in equity to cancel and annul certain assignments of mortgages executed by respondent James Heney in favor of respondents Trenmor Coffin and William Woodburn, upon the ground that the assignments were made in fraud of the rights of the United States. A suit between the same parties, arising out of the same transaction, had been previously brought in the United States circuit court for the Northern district of California;

83 F.—22

and an injunction was there issued against the respondents and others, enjoining them from proceeding with the foreclosure suits which Coffin and Woodburn had respectively commenced. When that cause came on to be heard before Judge McKenna upon the motion to dissolve the injunction, proceedings were had which resulted in the court making the following order:

"After argument, and upon the consent of the parties this day appearing in open court, the restraining order heretofore issued herein is so modified as to permit the parties to the foreclosure suit mentioned in the bill herein to proceed therein as they may be advised: provided, that any and all moneys received from the sale of the mortgaged premises shall be deposited at once with T. J. Edwards, Esq., clerk of the United States circuit court for the district of Nevada, at Carson City, Nevada, to abide the result of any action or proceeding that may be instituted by the United States to determine the bona fides of the assignment of the mortgages mentioned in the bill herein to the defendants Trenmor Coffin and William Woodburn: provided, such action or proceeding is instituted in the district of Nevada within thirty days from the date hereof. Further ordered, that this action shall be and stand dismissed at and upon the expiration of thirty days from this date, without prejudice to the right of complainant to commence another action against the same parties for the same cause of action."

This suit was commenced within the 30 days therein specified.

From the testimony in this case it appears that on December 21, 1895, James Heney was convicted in the United States district court for the district of Nevada of a felony, to wit, of the crime of unlawfully and feloniously taking and carrying away and converting to his own use gold metal from the United States mint at Carson, the property of the United States, of the value of $23,000. He was ordered into the custody of the marshal, and the court announced that sentence would be imposed on December 24, 1895. The marshal placed the prisoner in the county jail. Within a few hours after his conviction it was suggested that some steps be taken to secure the counsel, Trenmor Coffin and William Woodburn, who had defended him, their fees. There assembled in the private room of the county jail, in addition to the jailer, prisoner, and his counsel, Mrs. James Heney, her brother, Robert Barnes, and Sheriff Kinney; the latter being called in as a witness. There is more or less conflict as to the conversations, and some controversy as to the actual transactions, which there took place. The prisoner was possessed of money, and was the owner of several mortgages, which he had transferred to Jacob Klein, president of the Bullion & Exchange Bank, as security to indemnify him on account of any damages he might sustain by reason of his being a surety, with others, upon a bond conditioned for his appearance in court to abide any judgment that might be rendered against him under the indictment. The property thus assigned consisted of $4,000 in money, a mortgage executed by Margaret Warde, for the sum of $6,200, upon property situate in San Francisco, Cal.; a mortgage executed by H. S. Dawson and wife, for the sum of $3,000, upon property situate in San Francisco, Cal.; a mortgage executed by M. Callahan, for the sum of $2,500, upon property situate in Washoe county, Nev. The money was deposited in the bank, and of the amount there had been drawn out, during the two trials of the criminal case, by Heney, or upon his order, for purposes not disclosed in the evidence, the sum

of $2,400, leaving at the time of Heney's conviction the sum of $1,600. This amount had been, before the hour of closing the bank, withdrawn by Coffin, and placed in his own safe. This was done before Heney's conviction. On the night in question, at the jail, the $6,200 mortgage was assigned by Heney to Woodburn, the $3,000 mortgage was assigned by Heney to Coffin, and the $2,500 mortgage was assigned by Heney to his wife, Mary Heney. The money ($1,600) was brought to the jail by Coffin, remained there during the transaction, and was afterwards—less the sum of $120, retained by Coffin for certain expenses—delivered over by him to Mrs. Heney. On December 24, 1895, Heney was sentenced to a term of years in the penitentiary, and to pay a fine of $5,000. Briefly stated, the contention of the government is that the assignments were made and delivered for the purpose of defrauding it of its chance to collect any fine which might be imposed by the court upon Heney. The contention of respondents Coffin and Woodburn is that the assignments to them were made in good faith, for value, for the purpose of paying to them the amount due on their fee, and that the assignments were absolute,—without any conditions whatever. The contention of respondent Heney is that the assignments were made in good faith to secure counsel their fees, and that, when the amount of the fees were deducted from the proceeds of the sale, the balance was to be paid over to his wife. Coffin claims that there was and is due to him the sum of $2,000 as a fee. Woodburn claims that his fee is $3,500. Heney claims that he made a special agreement with each of his counsel,—that Woodburn was to receive $2,000 in case of acquittal, and only $500 in case of conviction; that Coffin was to receive $600 in case of acquittal, and $500 in case of conviction; that Woodburn received $70, and Coffin $400, leaving a balance due to Woodburn of $430, and a balance due to Coffin of $100.

The case, as presented, is in many respects unsatisfactory. It is by no means clear. Any attempt to unravel it and get at the bottom facts is met by difficulties of all kinds, which are not easy to overcome. This court is unwilling to say that any testimony that would tend to elicit the truth has been suppressed, yet the impression remains that the whole truth of the transaction has not been fully disclosed. There are many admitted facts in the testimony that tend to establish the broad proposition for which the government contends. The inferences to be drawn from the time, manner, and circumstances of the transaction point very strongly that way. Heney was convicted Saturday night. In anticipation of his conviction, the money and securities in the bank had been withdrawn, and placed in the possession of Mr. Coffin. Tuesday was the day set for sentence. It was known that Heney would not only be imprisoned, but that a fine would also be imposed. The law so provided. Although possessed of ample means, sufficient to discharge his indebtedness to counsel and to pay his fine, his property had been put out of his hands. When placed in custody of the officer, his bondsmen were released, and were ready to surrender the property to whom it might belong. If turned over to Heney, it might be reached upon execution. Having been successful in unlawfully obtaining from the government a large sum of money, he evidently desired to save as much of his ill-gotten

gains as he possibly could, either by fair or unfair means.   He proposed to his counsel that they should take the mortgages, ostensibly for their fee, but with the private understanding that it was only as collateral security.   With all due formality, after signing and acknowledging the assignment which admitted the receipt of $6,200 as the consideration, he handed the mortgage over to Mr. Woodburn, and said, "This is yours," and the same public formality and declaration accompanied the transfer of the other mortgage to Mr. Coffin. In the next breath, and in a different part of the room, and in a lower tone of voice, was told the story that the assignments were only intended as collateral security.   The witness Kinney and others heard both statements.   But the question arises whether these suspicions, strong as they are, of an intended fraud by Heney upon the government, are sufficient to justify a decree of this court to cancel and set aside the assignments of the mortgages to his counsel upon the ground of actual fraud.   Fraud is never to be presumed, but, like every other fact, it may be proved by circumstances.   Courts, while not indulging in presumptions of a questionable nature, should never refuse to draw from uncontroverted facts the legal inferences which naturally and logically flow from them.

The respondents, when served with process herein, filed their joint and several answer, denying that they, or either of them, entered into or knew of any scheme or combination to defraud the United States or any other person in any manner whatever, or to elude, hinder, or delay the payment of any fine imposed against Heney; that the mortgaged property had greatly depreciated in value, and would not sell for more than enough to pay the fees of counsel; that the assignments were made bona fide in payment of fees due from Heney. Other averments were made, as to the relation of the counsel towards Heney, and as to the purpose for which the assignments were made, which need not be mentioned.   Before the trial, Heney appeared in court, and asked leave to file a separate answer, stating that he had never been consulted as to the defense that should be interposed, and that he was unaware of what action had been taken in the premises, and that he had never authorized Woodburn and Coffin, or either of them, to interpose an answer on his behalf.   Leave was granted. He then filed a separate answer, alleging "that said assignments were made, bona fide and in good faith, for the purpose of securing" his counsel for the amount due them for professional services, and then alleged the specific agreements he made with them concerning their fees, and asked for a decree that the balance remaining after foreclosure and payment of counsel "be adjudged and decreed to belong to this respondent's wife, Mary Heney."   After the case was tried and submitted, the court ordered that the money realized from the sale of the Dawson mortgage be forthwith deposited with the clerk of this court, in pursuance of the order and stipulation as made in the circuit court in San Francisco, and reserved the right to have further testimony taken; and subsequently, upon motion of complainant's counsel, the case was reopened, and a commission was issued to take testimony in San Francisco; and much additional information was there obtained as to the value of the mortgaged prop-

erty, and the manner in which the sale of the property under the Dawson mortgage was conducted, and also as to certain declarations of Trenmor Coffin as to other parties having an interest in the proceeds of the sale of the mortgaged property. The property under the Dawson mortgage was assessed at $2,800. It was sold under foreclosure sale to Mr. Coffin, August 18, 1896, for $1,750. The certificate of sale was assigned to Jane Coop in December, 1896, and shortly thereafter the property was sold for $2,466.40, and again sold in May, 1897, for $3,000. On May 8, 1897, Mr. Coffin's attorney forwarded to the clerk of this court the sum of $1,478.35, being the amount for which it was sold, less attorney's fees and expenses of foreclosure. It appears that prior to the foreclosure there had been much talk about the sale between Mr. Coffin and his attorneys, and also with other parties who had a subsequent mortgage on the property, and with Mr. Temple, attorney for Mr. Dawson, the mortgagor. There appears to have been an understanding that only $1,750 should be bid, and Mr. Coffin instructed his attorneys to only bid that amount. There had also been more or less conversation between the parties with reference to disposing of the property at private sale. Mr. Temple testified as follows:

"I proposed to him [Coffin] what I had already written,—that he should take $1,750, and release the mortgage, or not release it, assign the mortgage to a nominee, and that I wished to keep the mortgage alive for the protection of my client, Dawson. Mr. Coffin replied, in effect, * * * that he could not do as I asked, because he had to account for the proceeds of the mortgage to his client and his wife."

Touching this last proposition, Mr. Coffin, on May 7, 1896, addressed a letter to his counsel, in which he said:

"J. W. Dorsey, Esq., San Francisco—Dear Sir: Replying to yours of April 28, in regard to the settlement of mortgage in Coffin v. Dawson, I will say that I am not now in a position to make any settlement whatever for less than the amount due upon the mortgage, for the reason that other parties have an expectancy in the mortgage in case the full amount is collected, and I would be censured if I would take less than the full amount. * * * Press the foreclosure sale as soon as possible, and I will probably have the property bid up to near its cash value at the sale.

"Yours,                              Trenmor Coffin."

The property under the Warde mortgage, held by Woodburn, has not yet been sold. Mr. Woodburn, in giving his testimony as to what occurred when the mortgages were assigned, said:

"Mr. Heney did say to me after the mortgage was given to me— He gave it to me himself— He said: 'You take the larger mortgage; and, Coffin, you take the smaller one.' The only conflict that occurred was between me and Mr. Heney, as to the value of the property. My information led me to believe it had dropped 40 or 60 per cent., and Mr. Heney claiming it was worth the face value. Mr. Heney said to me, in giving the mortgage: 'Woodburn, if you realize the face value of that mortgage, will you ever see Mary want for anything?' I said: 'No, sir; I will not.' I never expected $6,200 for my fee, and it was all open and aboveboard, before everybody there. I never expected $6,200. I never expected to realize half of it."

The whole case, in all of its features, presents very remarkable characteristics. There is something radically wrong about the transactions, requiring close scrutiny and searching investigation. The inferences to be drawn from all the testimony are such as to excite

the vigilance of any tribunal compelled to pass upon the fairness of the transactions. It looks unreasonable, to say the least, that a man of Heney's financial shrewdness, whose desire seems to have been to obtain money by any means, and to keep all he gets, would, after his conviction of a crime, where the facts, as here, left no hope for any legal escape from his punishment, voluntarily have turned over property which, upon its face value, and the weight of testimony, is worth over $9,000, in payment of an indebtedness of only $530, as claimed by Heney, or even for $5,500, as claimed by the other respondents, unless there existed some other motive or understanding. The testimony of respondent Heney, under all the circumstances and surroundings in which he is placed, is to be weighed with suspicion; yet in some respects it evidently bears the earmarks of truth, and is supported by the testimony of others, free from all taint of doubt or interest in the result of the suit, and ought not to be, and cannot be, entirely discredited. Respondents Woodburn and Coffin earnestly claim that all their acts in the premises were in the utmost good faith, and vigorously disclaim any intention or purpose to defraud or take undue advantage of anybody. As to them, the strongest inferences of fraud arise from their contention that the assignments of the mortgages were absolute, in payment of their fees, and from the manner in which the sale of the property under the Coffin assignment was conducted. That they had the right to secure the payment of their fees is unquestioned, if in so doing they acted openly and honestly, without any design to defraud others having an interest in the bona fides of the transaction. Having carefully weighed all the testimony in the case, my conclusion is that it is insufficient to justify a decree setting aside the assignments on the ground that they were executed for the purpose of defrauding the United States.

The United States pray for such other and further relief as in equity and justice they may be entitled to, and this calls for the judgment of the court as to what the real consideration and purpose for which the assignments were made were. The weight of the testimony —which need not be further commented on—clearly shows that the assignments were made to secure counsel their fees, and that the understanding between counsel and Heney was that the balance of the money realized from the foreclosure sale, after payment of the costs and expenses of sale, and deducting the fees of counsel, should be paid over to Mr. Heney, or to his wife. What fees were due from Heney to Woodburn and Coffin at the time the assignments were made? As to the amount due Woodburn, it is admitted by counsel for the government and for Heney that the weight of the testimony shows that it was originally fixed and agreed upon at $2,000, without any contingency as to acquittal or conviction; and the court, from all the testimony, so finds. Woodburn's claim for $3,500 arises out of the fact that during his employment, under this understanding, he was discharged by Heney, and that a new agreement was made, whereby Heney promised to pay whatever his services were reasonably worth, and that upon those terms he came back into the case. Heney admits that there was a misunderstanding, and talk of Woodburn withdrawing, but denies that he was discharged, or that any new agreement

was made. The terms as to Woodburn's discharge, as testified to by him, were never complied with. The differences between them were amicably adjusted within two days, without detriment, loss, or damage to either. There is a decided conflict as to the amount agreed to be paid Coffin. The question is not free from doubt. Coffin came into the case at the "eleventh hour." Neither he nor Heney wanted anybody else to know what the fee should be, and this is the only fact concerning this transaction upon which there is no disagreement. Coffin's statement as to the fee is as follows:

"Mr. Heney asked me * * * before the trial what I would charge. I told him, 'One thousand dollars.' He did not want to pay so much, and I always declined to mix up with the case in any way for less than $1,000; and on Saturday evening before the trial, which was coming on Monday, he asked me again if I would not take his case for less than $1,000, and I told him, 'No.' I said: 'Mr. Heney, I don't think you want me in the case, and I do not think you need me. Mr. Woodburn can try your case, and I do not think you need me;' and I got up and started out. I felt a little disgusted about it, and, when I was at the door,—just opened the door,—Heney, from behind the counter, called me to come back, and said he wanted me in the case, and repeated again that it would not take to exceed a week, and asked me if I would not take $500; and I said: 'If it can be tried in a week, I will take it for $500; and if, on Saturday night, you pay me $500, that will be in full for my services up to Saturday night.' But I said again it would be impossible to try that case in a week, and my fee would be $1,000 for trying the case. And that was the last that was said about the fee until after the trial, when I asked him for it, and he explained why he could not pay. * * * I declined to go into the second trial until I was paid for the first. He said he could not pay, and I insisted, and he got me $300; and I said the fee for the second would be the same, making $2,000."

The first trial of Heney occupied two weeks. Heney's version is, that:

"Mr. Coffin was to get $600 if I was acquitted; he was to get $500 if I was convicted,—if the case was to be tried once or a dozen times."

In reply to the question, "Was that agreement reduced to writing?" he answered:

"No; I wanted Mr. Coffin to give me a writing for it, and he said he would not do it. He wanted no one to know. He said his fee was so cheap that he was ashamed of it; he was engaged by Mr. Jones, and wanted to be in court anyhow; and he wanted to follow the case."

Mr. Heney was called in rebuttal, and upon his cross-examination, in reply to questions, answered as follows:

"Q. Did you ever have more than one contract with Mr. Coffin? A. I never did, sir. Q. Was that made before or after the trial commenced? A. It was made on Saturday night previous to the trial,—pretty late. Q. Was there any agreement between yourself and Coffin that the fee agreed ($500) * * * should be for one week's work? A. Nothing of that kind stipulated in the agreement at all. The case was to be tried for $500 if it was to be tried once or a dozen times, and $500 if I was convicted; and, if I was to be acquitted, he was to have $600, if I was to be tried once or a dozen times. Q. After that first trial, did you ever have any other agreement? A. No. * * * Q. When did you first know he charged $2,000 for his services? A. When I heard his answer read; * * * the day I came up the first time; the day it was postponed. That was the first I knew of it,—the first time I came up here, and concluded to file a separate answer."

Accepting Mr. Woodburn's and Mr. Coffin's versions of the main agreements, as to the fee for Mr. Woodburn of $2,000, and of Mr.

Coffin of $1,000, without any contingencies of acquittal or conviction, I do not feel authorized, from all the surrounding circumstances in this case, to allow them the full amounts respectively claimed, or any sum greater than just stated, from which will be deducted the amounts heretofore paid. Heney was under indictment for a serious offense. He was anxious to have a definite understanding as to the amount of the fees he would be called upon to pay. When once fixed and agreed upon, the amounts should not be raised, during the progress of the trial, to the seeming disadvantage of the client. The law is well settled that, in all transactions between an attorney and his client, the attorney, in a matter of advantage to himself, is bound to show that the transaction is fair, just, and equitable; that his client was fully informed of his rights in the subject-matter of the transaction, its nature and effect; and that he was placed in such a position as to be able to deal with the attorney at arm's length. The general rule is clearly and correctly stated in 3 Am. & Eng. Enc. Law, 332, as follows:

"In all dealings with his client, the highest degree of fairness and good faith is required of the attorney. The courts view all such transactions with suspicion, and examine them with the utmost scrutiny; and, if they present even a suggestion of unfair dealing, the burden of proof lies on the attorney to show the honesty and good faith of the transaction, and that it was entered into by his client freely and understandingly."

See authorities there cited; 1 Lawson, Rights, Rem. & Prac. § 176, and authorities there cited; Kisling v. Shaw, 33 Cal. 425, 440; Felton v. Le Breton, 92 Cal. 457, 28 Pac. 490; Ross v. Payson, 160 Ill. 349, 43 N. E. 399; Burnham v. Heselton, 82 Me. 495, 20 Atl. 80; Cooper v. Lee, 75 Tex. 114, 12 S. W. 483.

The burden of proof is always upon the attorney to show the absolute fairness of the transaction. In Elmore v. Johnson, 143 Ill. 513, 525, 32 N. E. 413, the court, in discussing this question, said:

"Before the attorney undertakes the business of the client, he may contract with reference to his services, because no confidential relation then exists, and the parties deal with each other at arm's length. The same is true in regard to dealings which take place after the relation has been dissolved. 1 Story, Eq. Jur. (13th Ed.) 310-313. But the law watches with unusual jealousy over all transactions between the parties which occur while the relation exists." Morange v. Kling, 93 N. Y. 381; Tenney v. Berger, Id. 524; Cotzhausen v. Trust Co., 79 Wis. 613, 49 N. W. 158; Weeks, Attys. at Law, §§ 250, 255, 268.

The views already expressed dispose of all the questions in this case, except as to the disposition to be made of the money that has been and is to be paid to the clerk of this court from the proceeds of the foreclosure sales. No order in that regard will be made until after the sale of the property under the Warde mortgage, and after the proceeds are deposited in this court as heretofore agreed by counsel and ordered by the court.