Argued October 7, reversed and dismissed November 23, 1920, rehearing denied January 18, 1921.

## CRIM *v*. THOMPSON.

(193 Pac. 448.)

**Quieting Title—"Cloud on Title" Defined.**

1. A "cloud upon title" may be defined substantially as an estate in or encumbrance upon real property which is apparently valid but in fact without foundation.

**Quieting Title—Valid Judgment and Sale Thereunder not a Cloud on Title.**

2. Where defendant, who was acting as attorney for plaintiff in former litigation when a judgment was rendered against her, subsequently purchased land sold under execution issued on such judgment, such facts did not constitute a cloud on title in absence of any showing of invalidity in the judgment.

**Judgment—Decree Awarding Defendant Attorney a Lien Held Inconsistent With Plaintiff's Allegations of Advances to Defendant.**

3. Where a complaint alleged that defendant, while formerly acting as plaintiff's attorney and having in his possession money belonging to plaintiff applicable to the satisfaction of a judgment rendered against her, permitted the judgment to remain and caused or connived at issuance of execution thereon against her land which he purchased at the execution sale, a decree treating the sheriff's deed as a cloud on her title, but awarding the defendant a lien, was inconsistent with the averments of the complaint that defendant had possession of plaintiff's moneys sufficient and applicable to discharge of the judgment.

---

6. On right of attorney to purchase from adverse party subject. matter of employment, see note in Ann. Cas. 1915C, 953.

On right of attorney of party to proceeding to purchase property at judicial sale, see note in 21 Ann. Cas. 274.

On right of attorney to purchase subject matter of litigation or retainer from client and his duty in relation thereto, see notes in 23 L. R. A. (N. S.) 679, and 28 L. R. A. (N. S.) 723.

**Evidence—Presumption That Clerk Issuing Execution Performed Duty Held not Overcome by Testimony.**

4. The presumption that a clerk issuing an execution did so regularly at request of plaintiff, and not defendant's counsel, *held* not overcome by such clerk's testimony a few years afterwards that the best of her recollection was that she issued it at request of defendant's counsel.

**Attorney and Client—Evidence Held not to Show Conversion of Client's Funds.**

5. Evidence *held* insufficient to show that an attorney supplied with funds applicable to a judgment converted them to other uses.

**Attorney and Client—Attorney may Purchase Land Sold Under Judgment Against His Client After Relation Terminated.**

6. Where suit against client was brought in 1914 and judgment against her was enrolled the same year, the entry of which ended the relations between her and her counsel, he claiming compensation unpaid, a purchase by him under execution sale under such judgment in 1917 was not fraudulent.

From Clackamas: JAMES U. CAMPBELL, Judge.

Department 1.

The complaint charges that during the years 1912, 1913, and 1914 the plaintiff employed the defendant as a practicing attorney to attend to legal business for her and especially look after and protect her interests in her suit for divorce against her then husband, pending in Multnomah County, and for the ejectment of him from her real property in Clackamas County. This is admitted by the answer. The plaintiff further states, substantially, that afterwards the defendant frequently called upon the plaintiff to advance what he claimed to be necessary costs and expenses of said litigation, in pursuance of which she paid him, "besides other sums, the amounts of which are too numerous to mention and the items of which this plaintiff is unable now to determine with any degree of certainty or at all," designated amounts of money which she sets out in her complaint.

The answer admits the defendant received all of these amounts so stated, with the exception that on

February 24, 1913, the plaintiff paid the defendant $11 only, instead of $15, as charged in the complaint.

The plaintiff states that as a result of the Clackamas County ejectment case a judgment was rendered against her in this court for costs in the sum of $57, and additional costs in the Circuit Court of $13.50, totaling a judgment against her and in favor of her former husband in the sum of $70.50. This is also admitted and established by the record. The following allegation then appears:

"That said defendant was furnished with ample and sufficient funds with which to pay all sums of costs, expenses and fees properly chargeable against this plaintiff, and this plaintiff was assured by defendant that he had fully paid all such costs, charges and fees so due and chargeable against this plaintiff."

This quoted averment is denied by the answer. The complaint further charges that the defendant afterwards secretly and fraudulently induced the owner of the judgment against her to issue a pretended execution against the real property of the plaintiff, described in the complaint, and in July, 1916, caused the sheriff of Clackamas County to levy upon the premises, without any directions to that officer concerning plaintiff's personal property; on August 25, 1917, exposed the same for sale and bought in the property for fifty cents, and no more, in excess of the amount then due on the judgment, purchasing it in his own name; on September 18, 1917, secured from the court a pretended order confirming the sale, and afterwards clandestinely and without the knowledge of or notice to the plaintiff obtained from the sheriff a deed to the property, which he filed and recorded, the property being of the

value of $3,000. It is said that the plaintiff had no notice of the entry of the judgment for costs, of the fraud of defendant in not applying the funds advanced to him upon the costs of the litigation, or of any of the proceedings connected with the said sale, until shortly after the pretended deed was filed for record. She claims that the deed constitutes a cloud upon her title, and prays for an order annulling the same and for such other and further relief as may be agreeable to equity.

These allegations of the complaint are denied by the answer except as stated therein. As mentioned above, the defendant admits receiving the moneys noted in the complaint, except $11 instead of $15 in one payment, and says that those are all of the sums of money paid by the plaintiff to him during the whole litigation; that they were applied upon the expenses thereof, taxes on the land mentioned in the complaint, and attorney's fees, as requested by the plaintiff; and that he fully protected the plaintiff's interests in all of the litigation brought by him on her behalf, without being paid for the years of service rendered, except $29.98, which he says was applied by him on attorney's fees, "to cover defendant's personal expenses in making numerous trips to Oregon City, two trips to Oregon Homes, two trips to Salem, Oregon, and other incidental expenses, all in connection with the plaintiff's said business." This, in turn, was denied by the reply.

Under these pleadings the Circuit Court arrived at the conclusion of law that the defendant should have purchased the property in the name of the plaintiff and should have procured the deed in her name, and, having failed to do so, a trust resulted in favor of the plaintiff against the defendant entitling the former to

a decree establishing the same and requiring a conveyance from the defendant to her; and that the defendant is entitled to an equitable lien on said described property for the amount of money paid by him to the sheriff at said sale, to wit, $123. A decree was entered accordingly, together with costs in favor of the plaintiff. The defendant appeals.

REVERSED AND DISMISSED.

For appellant there was a brief with oral arguments by *Mr. T. A. Hayes* and *Mr. A. G. Thompson.*

For respondent there was a brief over the names of *Mr. C. D. Latourette, Mr. John Ditchburn, Mr. D. C. Latourette* and *Mr. Earl C. Latourette,* with oral arguments by *Mr. C. D. Latourette* and *Mr. Ditchburn.*

BURNETT, J.—1, 2. A "cloud upon title" may be defined substantially as an estate in or encumbrance upon real property which is apparently valid but in fact without foundation: 2 Words & Phrases, 1233. No attack is made upon the validity of the judgment upon which the execution was issued. It was a valid, substantial claim upon the realty of the plaintiff. The execution was fair upon its face, constituting authority to the sheriff to sell the land for want of personal property, as he certifies in his return. As the sale was confirmed without objection and it did not appear that when the cause came on for confirmation of sale there was or could have been an objection to the regularity of sale, the deed followed as a matter of course, and is not void. It rests upon a regular judgment, execution, and sale. It can be disturbed only as between the parties, and then only because of some trust relation existing at the time of

the sale or some fraud vitiating the transaction. Strictly speaking, the complaint does not state facts sufficient to constitute a cause of suit to remove a cloud, for it does not appear that the judgment, the foundation of the alleged cloud, was in any way invalid.

3. The most that can be derived from the complaint is, that it charges the defendant with having in his possession money belonging to the plaintiff applicable to the satisfaction of the judgment, and that, being so equipped with her funds, he embezzled the same, was recreant to his trust, and bought the land in his own name, when he should have satisfied the judgment without the necessity of a sale. Stripped of all technicalities about the relation of attorney and client, this is the charge, in effect, against the defendant. The Circuit Court seems to have placed its decision upon the relation of attorney and client which once existed between the parties to this suit. It is apparent that the trial judge gave no credence to the averment that the defendant had received other sums of money in addition to those specified in the complaint, for he allowed the defendant an equitable lien upon the premises for the amount which he paid at the sale. This is inconsistent with the averments of the complaint; for if, as that document states, the defendant was furnished with ample and sufficient funds to pay this judgment, and did not pay it, he was not entitled to any lien upon the premises for what he did pay. In equity, as well as at law, the object of pleading is to notify the defendant of the cause of suit the plaintiff has against him, so that he may be advised in time to prepare his defense; and the decree must substantially follow the pleading: *Coughanour* v. *Hutchinson,* 41 Or. 419 (69 Pac. 68);

*Union Street Ry. Co.* v. *First Nat. Bank,* 42 Or. 606 (72 Pac. 586, 73 Pac. 341).

It appears in evidence that the plaintiff here had commenced a divorce case in Multnomah County, which was finally decided in this court against her, July 29, 1913, and in which the defendant acted as her attorney. During the trial of that case it was elicited that the plaintiff and her husband had contracted to buy some land from one Smalley and to take title in the name of both husband and wife. Whether by the entirety, or as tenants in common, does not appear. On the trial of the Multnomah County divorce case the defendant there disclaimed any interest in the contract and stated in substance that he had abandoned it. After the decision of that case in her favor in the Circuit Court, the plaintiff here took up the matter through the defendant as her attorney, with Smalley, who agreed to give a joint deed, as the contract called for, to whoever paid him the money. The plaintiff here paid the balance due upon the contract and took the deed, as stated. At her request the defendant then instituted in Clackamas County, where the land is situated, an action in ejectment against Mr. Crim, to recover possession of the property. She succeeded in obtaining a judgment against him in the Circuit Court for that purpose. In pursuance of that judgment the defendant here caused an execution to be issued, placing her in possession, and by authority thereof she was actually installed upon the property. This ejectment case was tried in the Circuit Court March 5 and 6, 1913. It was reversed in the Supreme Court March 24, 1914, and a mandate was issued April 23, 1914, and filed in the Circuit Court of Clackamas County June 2d.

Afterwards, as it appears from the testimony, the plaintiff employed other counsel and began a second suit for divorce, in Clackamas County. She prevailed in the Circuit Court and the case was affirmed in this court. We thus have two divorce cases, that brought in Multnomah County, which the plaintiff lost on appeal in this court after having gained it in the Circuit Court. The third in point of time, of the three cases, was the divorce suit in Clackamas County, in which the plaintiff here was finally successful; and the second, being the ejectment case, resulted in a judgment against her, upon which the sale in question was founded.

The charge in respect to the execution is to the effect that the defendant, disregarding his duty to the plaintiff as her attorney, secretly and fraudulently induced the owner of the judgment in the ejectment case to issue execution. That document recited on its face that, after the rendition of the judgment in favor of Crim, he assigned it to his attorneys, Kimball and Ringo. Both of these gentlemen testify plainly and unequivocally that they issued the execution on their own account, without consulting the defendant. It seems that there were two executions issued upon this judgment, the first on July 27, 1916, which was returned July 18, 1917, unsatisfied for want of bidders at the sale. On this latter date the execution was issued upon which the sale took place. The defendant testifies that he made no requests of anyone for the execution and did not know that it had been issued until about five days before the sale. The only evidence to the contrary of this appears in the plaintiff's rebuttal coming from Miss Iva M. Harrington, who was county clerk of Clackamas

County at the time the last execution was issued. Called upon to testify about that, she said:

"The best my memory serves me, it was issued at the request of Mr. Thompson, asking me to make an exact copy of the other execution that was returned the same day. * *

"Q. What is it in particular that recalls this incident to your mind?

"A. I remember just where Mr. Thompson stood, and it was—what makes me remember it, how I happen to recall it, it seemed like a peculiar circumstance to me. I can't remember what I said to him at the time, but anyway I asked him some question, and the way he answered me made me remember what the circumstances were."

She does not recall what was done after she had finished writing out the execution on her typewriter. She does not remember whether she gave the writ to the attorney who asked for it, or took it to the sheriff's office. Nor does she recollect whether or not she issued another execution in the case besides the two mentioned. Quoting from her memory of the record, she says that it shows that the execution of July 27, 1916, was issued at the request of either Kimball or Ringo, but the record does not show that the last execution was issued at the request of Thompson. In answer to this rebuttal testimony, the defendant testified, denying flatly that he had anything to do with, or asked the county clerk to issue, the last execution in the case, upon which the sale was made. He says that the only execution he had anything to do with in the ejectment case was the one which he caused to be issued to put the plaintiff here in possession of the premises; and he says, in respect to that, that Miss Harrington was then a deputy in the county clerk's office, was the only one there with whom he was ac-

quainted, and that he talked to her about that execution. She does not deny that he talked to her about the possessory execution. Apropos of this phase of the testimony, we find in section 213, Or. L., that—

"The party in whose favor a judgment is given, which requires the payment of money, the delivery of real or personal property, or either of them, may at any time after the entry thereof have a writ of execution issued for its enforcement, as provided in this chapter."

4. Under this statute the county clerk would not have authority to issue a writ of execution on the request of anyone but the party in whose favor the judgment is given, or probably his assignee. That officer would have no right to issue execution at the behest of any other party to the suit. We must presume that the officer did her duty regularly, which would be in contradiction of what she here says, to wit, that she issued the execution on the order of someone who had no authority for that purpose. We have, then, the testimony of both Kimball and Ringo, the attorneys for Crim and assignees of the judgment, together with that of the defendant himself, that the latter had nothing whatever to do with, or knowledge of the issuance of, the execution, which is enforced by the presumption that the clerk did her duty regularly and issued the execution at the request of Kimball or Ringo, who were attorneys for the prevailing party. Opposed to this is the testimony of Miss Harrington, who simply says that, "the best her memory serves her," the defendant requested the issuance of the writ. Under these circumstances, the preponderance of the evidence is clearly against the allegations of the complaint to the effect that the defendant procured the execution to be issued. It is

far more likely that Miss Harrington has confused the last execution with the one issued for the possession of the property. It would be the natural course of events for the defendant, as attorney for Mrs. Crim, having gained the ejectment case in the Circuit Court, to cause the execution for the possession to be issued. We find, therefore, that the defendant did not cause the issuance of the execution now in question.

We come next to the heart of the charge, viz., that the defendant had money in his hands belonging to the plaintiff sufficient to pay the judgment. The testimony of the plaintiff is characterized by contradictions of her own statement and of the record of the proceedings in the cases mentioned, and by lapses of memory which discredit her as a witness. It appears in evidence that she had caused the arrest of her husband in Multnomah County for nonsupport of herself and their children. Being dissatisfied with the efforts of the district attorney to prosecute the case, she called the defendant into the case. After repeated arguments on demurrer the Circuit Court finally held that the complaint was bad and the case was dismissed. Both she and the defendant agree that all claims which he had against her for fees or costs in that matter were settled about the time she began her suit for divorce in Multnomah County. She says that Thompson brought the ejectment case for her and that she won it. She declares that she thought when she won the ejectment action she was divorced then, and that she does not think the ejectment case was appealed to the Supreme Court. She says: "I am not sure, because since I am sick I am not sure of anything."

98 Or.—39

We are informed by her testimony that she went to California in the spring of 1917, and that while there in August of that year she suffered a stroke of paralysis accompanied by a "loss of memory, loss of flesh, and everything." She says that she had not heard and did not know. that she had a case in the Supreme Court. She declares that she paid Thompson something nearly every week, beginning in 1912 and ending in 1913. Asked to tell what the arrangement was, she answered:

"Well, I promised to pay him just as I could; just pay him along for the costs of everything.

"Q. The costs?

"A. Yes, sir; and I supposed he would get the fees from the other side when he wanted them. I guess that is what I want to say. ·

"Q. He said?

"A. No. That is what I say.

"Q. What was the agreement with him? What did he say about fees?

"A. Well, I think that is just about what he said.

"Q. Can you repeat substantially the arrangement you had with him?

"A. No, sir; but I can say I was to pay the costs of everything.

"Q. What do you mean, the costs?

"A. Well, what the cases would cost for briefs and things he had to have."

In respect to getting attorney's fees from her defendant husband, the defendant in this suit testified that, when the plaintiff consulted him about commencing the first divorce suit, he told her that, if she was successful in the suit, she perhaps would recover something from Crim to meet her attorney's fees. He said in his testimony that the decree of the Circuit Court allowed $75 for that purpose, but as that decree was reversed nothing was collected on that

account. The ejectment action was not instituted until after the first divorce decree was entered in the Circuit Court and it is not likely that the defendant made any such statement with reference to the action.

Asked to tell when her payments to the defendant started and how long they continued, the plaintiff testified:

"Well, I could not say exactly. I know I went downtown every week—not every week, but I will say nearly. I went down nearly every week and paid him something. Sometimes he would give me a receipt, and sometimes he would not. * *

"Q. I will ask you first if you can approximate about the amount you paid during the year, or a little over a year, approximately how much you paid in an aggregate sum?

"A. Well, I don't hardly know. I think it amounted to about four hundred dollars.

"Q. You paid him in cash?

"A. Yes, sir; because I have receipts for part of it, and he did not give me receipts for all of it."

In passing, it may be remarked that during the trial of this case the defendant called for the receipts he had given her and they were not produced. She first declared that the way she got the real property was through the decision of the Supreme Court in the second divorce case, and immediately afterwards she answered that she got it by the ejectment action. She was asked whether that action was appealed, and answered: "No, sir; I don't remember it."

She admits getting a letter from Thompson dated March 26, 1915, which is in the record, and having a statement of her account since that date. The statement which she admits receiving is dated April 2, 1914, which was after the reversal of the ejectment case in this court. It is addressed to the plaintiff as

a statement of her account to that date. She is charged with attorney's fees in the Multnomah County cáse of $75, and on appeal of that case to this court, $150; attorney's fee in the ejectment case in the Circuit Court, $75; in this court, $250—totaling $550. Then follows a statement of items paid out by the defendant in the two cases in the Circuit Court and in the Supreme Court, totaling $112.65. The plaintiff 'is credited by the items of cash which she paid to the defendant as stated in the complaint, except the item of $15, which the defendant claims was $11. The total of her payments is $160, from which, after deducting the $112.65 of disbursements already mentioned, there remains a balance of $47.35, which he deducts from the charges of attorney's fees in all of the litigation, leaving a balance of $502.65 due him. The letter of March 26, 1915, written nearly a year after the date of the account, calls her attention to the statement which had been prepared sometime before at the plaintiff's request. The letter declares:

"You will see by the statement that I have given you credit for all sums paid by you to me, including all of the money that I expended on the four cases as necessary expense. The account shows that you paid me $47.35 more than I expended and I have given you credit for this amount.

"I have charged conservative fees for the work done, but if you can pay me or secure me for the same, I am willing to discount the bill to considerable extent."

The plaintiff admits receiving this letter and the account. There is another copy of an account dated March 14, 1913, prior to the final disposition of any of the litigation, which the defendant testifies he delivered in person to the plaintiff. It contains a statement of their affairs up to that time and corresponds

*pro tanto* with the more extended statement of April
2, 1914. There is still a third paper of this kind in-
troduced in evidence, which states the account as be-
fore, showing a balance of $502.65 in favor of the de-
fendant. This, he says, was a copy of the statement
which he sent her with the letter of March 26, 1915.
He declares that the plaintiff never made any objec-
tion whatever to any of the accounts. She does not
deny his statement on that subject and does not in-
timate in any manner whatever that she made any
objection, either to his charges or to the credits he
had given her for money which she had paid to him.

5. In such cases as *Truman* v. *Owens,* 17 Or. 523
(21 Pac. 665), *Holmes* v. *Page,* 19 Or. 232 (23 Pac.
961), and *Fleischner* v. *Kubli,* 20 Or. 328 (25 Pac.
1086), it has been held by this court that where par-
ties have had business dealings with each other, in
which there are items of debit and credit, a statement
of the same rendered by one to the other and received
without objection by the latter urged within a reason-
able time becomes a stated account binding upon the
parties, unless for fraud, error, or mistake, which
must be averred in the pleading of the party seeking
to open the account. Because it is not essential here,
we do not decide that the statements introduced in
evidence amounted to accounts stated; but they are
valuable in evidence as a statement made to the plain-
tiff and her conduct with reference thereto, with the
deduction that the defendant's account of the affair
is the more worthy of belief, especially where the bur-
den of proof rests upon the plaintiff, who affirms in
substance that the defendant had more money of hers
than the $160 with which he credits her, and which,
barring the difference between $15 and $11 already
mentioned, is all that she claims in her complaint that

she ever paid him. These statements were rendered to her, as the evidence shows, prior to the time that she suffered the stroke of paralysis. Presumably and apparently she was then amply capable of taking care of her own affairs, and if he credited her with only $160 when in fact she had paid him about $400, as she now thinks, it was her duty then to call his attention to the error. As a question of fact, we are impressed with the belief that the preponderance of the evidence shows that the defendant's statement of their monetary transactions is correct. Speaking in detail about her payments, he declares that some of them were applied directly by her on account of attorney's fees, which she does not dispute. Taken altogether, her statement is a vague, groping narration, proceeding from a defective memory, sometimes almost incoherent or at least contradictory. The cold record compels the conclusion that her statement, innocent though it may be, is not so credible as that of the defendant, who speaks circumstantially from the records of his office. The plain conclusion is that the defendant must be acquitted of what amounts to a charge of embezzlement.

6. The question then recurs, whether he was qualified to bid at the execution sale. We must bear in mind that the mandate in the ejectment case issued out of this court April 23, 1914, and was filed in the Circuit Court on June 2d of that year. The execution upon which the sale was made recites that the judgment of the Circuit Court on the mandate of this court was enrolled June 15, 1914. The sale occurred August 25, 1917, and was confirmed September 18, 1917, all more than three years after the entry of the final judgment marking the absolute determination of the litigation so far as the defendant was concerned.

The sheriff's deed bears date September 30, 1918. In *Newkirk* v. *Stevens,* 152 N. C. 498 (67 S. E. 1013), speaking to the point here in question, it is said:

"It must be true that the relation of attorney and client in a case like this one does not last forever. It ends at some time, and the time that the relation terminates in any particular case will depend upon the facts and circumstances and the nature of the employment or retainer. In the absence of special circumstances, 'the employment of an attorney continues as long as the suit or business upon which he is engaged is pending, and ordinarily comes to an end with the completion of the special task for which he was employed. At common law, the obtaining of a final judgment was such a termination of a suit as brought the relation to a close.' "

So, in *Knowlton* v. *Mackenzie,* 110 Cal. 183 (42 Pac. 580), the court said:

"For the purpose of prosecuting or defending an action the authority of an attorney ordinarily terminates with the entry of judgment: *Kellogg* v. *Gilbert,* 10 Johns. 220 (6 Am. Dec. 335); Weeks, Attys. at Law, § 239; except for the purpose of * * enforcing the judgment or seeking to have it set aside or reversed."

In *Harrison* v. *Murphey,* 39 Okl. 548 (135 Pac. 1137, 49 L. R. A. (N. S.) 1059), the defendant as attorney had once represented the plaintiff in various matters that had been closed up. He drew the mortgage for the plaintiff and, when it was foreclosed, bought the land from the purchaser at foreclosure sale. The court said:

"It is not shown that the defendant could have used, or needed to use, much less abuse, any information gained or position or situation attained through the relation of client and attorney, once existing. He had no duty to perform inconsistent with the purchase; there was no defect in his former work to be

assailed; no outstanding title was procured; no latent defect was availed of; when his relation terminated he left his clients possessing the fee. Had they met their obligations according to their tenor, there would have been no trouble. No trouble they now have is traceable to defendant. It cannot be the law that an attorney, in the absence of fraud or an abuse of confidence in some way, is forever debarred from acquiring property, honestly and in good faith, solely because it had formerly belonged to a person who at some time in the past had been his client."

In *Tobler* v. *Nevitt,* 45 Colo. 231 (100 Pac. 416, 132 Am. St. Rep. 142, 16 Ann. Cas. 925, note, 23 L. R. A. (N. S.) 702), it was said:

"At common law, the general rule is that the authority of an attorney to represent his client in an action ceases upon its final determination and the entry of judgment. Especially was this true as to the defendant's attorney—or, more accurately speaking, the attorney for the defeated party."

In *Smith* v. *Craft,* 58 S. W. 500 (22 Ky. Law Rep. 643), it is said:

"An attorney had a right to purchase claims against the firm, as in so doing he used no information obtained as counsel, nor took unfair advantage of the Welsh Coal Company, or its general creditors."

In *Elmore* v. *Johnson,* 143 Ill. 513 (32 N. E. 413, 36 Am. St. Rep. 401, 21 L. R. A. 366), the court lays down the rule that before the assumption of the relation of attorney and client, and after its expiration, the two deal at arm's-length, but not so while it is in existence.

In *Tancre* v. *Reynolds,* 35 Minn. 476 (29 N. W. 171), according to the syllabus, it is ruled that—

"An attorney who contracts with his client is subject to the *onus* of proving that, as respects the con-

tracts, no advantage was taken of the client's situation. But where a previously existing relation of attorney and client has come to an end, so that the parties are dealing, each for himself, at arm's-length, this strict rule does not apply; but to avoid the contract (otherwise unobjectionable), the client must show that it was procured by actual fraud.''

The testimony shows that, after the judgment in ejectment had been finally entered against the plaintiff here, she employed other counsel to carry on her subsequent litigation resulting in a divorce from her husband. She herself says she never saw the defendant afterwards. The plain conclusion of fact, independent of the presumption of law, is that their relation of attorney and client ended with the rendition of the final judgment in the ejectment action. The defendant explains why he bid in the property. He says in substance that the plaintiff owed him the balance of the accounts as he had stated it to her, and that he bought the property to protect his interests, for, if she suffered it to go to sale to someone else, she could assign her equity of redemption to some stranger and the defendant would be cut off from any means of securing his claim.

We have, then, an execution, as we believe the fact to be, issued, not at the request or with the knowledge of the defendant, but by the owners of the judgment, and a sale regularly advertised, at which the defendant, like anyone else, had a right to bid. There is no law compelling him to bid more than will carry the sale. It appears in evidence that a former execution upon the same judgment had been issued and returned for want of bidders. The sale, for aught that appears, was made fairly and openly, and the defendant was entitled to what benefit accrued to him on account of the sale, so far as anything appears in this

case. The plaintiff had gone to California, and until the day of sale the defendant had been unable to locate her. The attorneys Kimball and Ringo had unsuccessfully endeavored to get her to pay the judgment. She averred she had no knowledge of any of the proceedings connected with the sale, until shortly after the sheriff's deed was filed for record. She herself testified that in the spring of 1918 she was informed by a real estate man that the property had been sold and next morning she went to see her present counsel to have the matter investigated. The real estate man to whom she referred testified that in March, 1918, he told her the defendant had title to the property through execution sale. Her right to redeem did not expire until September 18, 1918, or one year after confirmation. It is evident from her own statement that she knew of the sale in time to redeem her property, but preferred to base her attack upon the defendant on a charge amounting substantially to embezzlement. The preponderance of the evidence is strongly against that theory.

For the purposes of this decision it is not necessary to go into an analysis of the authorities on setting aside a sale for mere inadequacy of price. It is sufficient to say that in all of the cases cited by the plaintiff the element appears that previous to commencing the suit the moving party had tendered to the purchaser the amount of his bid and had shown circumstances of fraud and concealment on the part of the defendant, or conduct lulling the plaintiff into repose, when a duty rested upon the purchaser to notify the former client. Having shown that the relation of client and attorney once existing had come to an end, no duty was cast upon this defendant, so far as the present record shows, requiring him to pay

any attention whatever to the plaintiff. As she had engaged other counsel, he might on that fact consider that his employment had ceased, independent of the rule of law on that subject. Owing no duty to her, he committed no fraud in attending the sale and becoming the highest bidder for the property. It is contended that it is an element of fraud that no effort was made to satisfy the judgment out of the plaintiff's personal property. It is not alleged, nor does it appear in evidence, that she had any personal property. The officer certifies that the levy upon and sale of the real property happened for want of personal property. The cases involving that point, cited by the plaintiff, all show that there was personal property in abundance belonging to the plaintiff within the knowledge of the moving party in the writ. No such condition appears here.

It is not apparent that the defendant violated any confidence between himself and his former client. The cases cited on that feature by the plaintiff relate to incidents where a secret advantage was taken of the client, who reposed confidence in the attorney, on the question involved. Here the action was commenced at the instance of the plaintiff, and it was a matter of public record, open to the inspection of all men. There was no private confidence involved. The judgment was the result of her own action. Of course, if the defendant had in fact money of the plaintiff in his hands sufficient to cover the amount of his bid, a tender of that sum as a prerequisite for commencing the suit would not be necessary. But the great weight of the evidence shows that this was not the situation; so that, if the plaintiff would now be let in to redeem, she must in any event herself first do equity by tendering to the defendant the amount

of money which he expended for the property. The conclusion is that she is not entitled to relief in equity. The suit will be dismissed without prejudice to either party in equity or law, as they shall be advised to proceed.

REVERSED AND DISMISSED.   REHEARING DENIED.

McBRIDE, C. J., and BENSON and HARRIS, JJ., concur.